**KANN et al.
v.
COMMISSIONER OF INTERNAL
REVENUE.**

**KANN'S ESTATE et al.
v.
COMMISSIONER OF INTERNAL
REVENUE.**

**Nos. 11066, 11067.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 16, 1953.

Decided Dec. 31, 1953.

Rehearing Denied Feb. 15, 1954.

R. J. Cleary, Ferdinand T. Weil, Pittsburgh, Pa. (Andrew L. Weil, Pittsburgh, Pa., on the brief), for petitioner.

Meyer Rothwacks, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Hilbert P. Zarky, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

We are asked to review two decisions of the Tax Court, 18 T.C. 1032, upholding certain income tax deficiencies and fraud penalties for the years 1936 through 1941. Petitioners are W. L. Kann and Stella H. Kann, his wife, and the representatives of Gustave H. Kann, deceased.[1]

A summary of the leading facts as stipulated and found follows. G. H. and W. L. Kann were brothers. During all the years in question both were shareholders, directors and officers of Pittsburgh Crushed Steel Company (hereafter called PCS), a Pennsylvania corporation, G. H. Kann being the president and general manager while W. L. Kann was secretary, treasurer and assistant general manager. The brothers Kann were similarly situated with respect to Globe Steel Abrasive Company (hereafter called GSA), an Ohio corporation wholly owned by PCS.

From 1936 through 1941 W. L. Kann personally kept the books and records of PCS and through checks of PCS and overstated credits in the personal accounts of the brothers, all concealed by various deliberately false and fictitious entries consisting chiefly of understated sales and overstated purchases, caused payments in the amount of $675,881.76 to be made to himself and his brother. During this period the brothers also received the sum of $66,000.00 in the form of checks from GSA, none of which were recorded on the books of that corporation. These checks were concealed as understated sales by the Kanns with the assistance and cooperation of the GSA secretary and general manager and the GSA bookkeeper. Neither the payments from PCS nor from GSA were reported as income by the Kanns. In addition to the above sums the brothers, during this period, also failed to report some $151,015.50 representing dividends received from Steelblast Abrasives Company, a corporation. As to these items, it was stipulated that the failure of W. L. and G. H. Kann to report them was due to fraud with intent to evade and defeat tax.

As the litigation was presented below petitioners contested the assessment of the income tax and the fraud penalties on the PCS and GSA payments on the ground that these sums, having been embezzled, did not constitute income under Section 22(a) of the Internal Revenue Code, 26 U.S.C. § 22(a),[2] as construed in Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752. Respondent's claim based on the Steelblast dividends was apparently not challenged. The Tax Court, conceding the difficulty of reconciling the embezzlements in the Wilcox case, which had been held not to constitute income, and the extortion in Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, which did, decided that the latter case was more near-

---

1. Gustave H. Kann died on April 9, 1953, after the decisions of the Tax Court had been entered. His executors were duly substituted as petitioners.

2. 26 U.S.C. § 22(a) reads in pertinent part as follows:
 "§ 22. Gross income
 "(a) General Definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of what- ever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

ly applicable to the situation before it and entered deficiencies and penalties aggregating $719,955.96. The court also resolved a second issue against petitioners W. L. Kann and Stella H. Kann, deciding that they had filed joint returns for 1937 and 1938.

A review of the authorities does indeed reveal what appears to be a conflict of views. In North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S. Ct. 613, 76 L.Ed. 1197, taxpayer had in 1916 disputed beneficial ownership of certain oil lands. A receiver was appointed in that year to operate the property and hold the net income. The United States, as the other party to the dispute, filed a bill in 1917 to establish its rights in the oil lands. Upon the district court's dismissal of the bill in that year the 1916 profits were paid to taxpayer. Appeals followed and the litigation was finally terminated favorably to taxpayer in 1922. In holding that the 1916 income should have been reported in 1917, the court said at 286 U.S. at page 424, 52 S.Ct. at page 615, 76 L.Ed. 1197:

> "They [the 1916 profits] became income of the company in 1917, when it first became entitled to them and when it actually received them. If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

Although the North American Oil case did not purport to hold that there *must* be a claim of right before there can be taxable income, the Wilcox case, citing North American Oil, did so state. In Wilcox the taxpayer had been a salaried bookkeeper for a Reno, Nevada, warehouse company. An audit of his books in 1942 disclosed that he had converted $12,748.60 of his employer's money to his own use in 1941. Most of the money was lost in Reno gambling houses. Wilcox was convicted in Nevada of the crime of embezzlement and served a jail term. His employer never condoned or forgave the conversion and still held him liable therefor. Wilcox did not include the embezzled proceeds in his 1941 return. The Commissioner asserted a deficiency and was sustained by the Tax Court. In affirming a reversal by the Court of Appeals the Supreme Court held that Wilcox' embezzlement did not constitute income under Section 22(a). While noting that it was immaterial whether the taxpayer's motive in acquiring the money was reprehensible or the mode of receipt illegal it nevertheless stated at 327 U.S. at page 408, 66 S.Ct. at page 549, 90 L.Ed. 752:

> "For present purposes, however, it is enough to note that a taxable gain is conditioned upon (1) the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return that which would otherwise constitute a gain. Without some bona fide legal or equitable claim, even though it be contingent or contested in nature, the taxpayer cannot be said to have received any gain or profit within the reach of Section 22(a). See North American Oil v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197." [3]

In Rutkin v. United States, supra, however, the majority of the court would seem to have discarded the claim of right test [4] in holding that money extorted under death threats was income within Section 22(a).[5] In so concluding the

---

3. See also Lewis v. United States, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560.

4. The court, at 343 U.S. 137, Note 8, 72 S.Ct. 571, 96 L.Ed. 833, listed examples of unlawful gains which were taxed under Section 22(a). It is clear that in

many of these situations the taxpayer had no more claim of right to the sums taxed than did Rutkin to the fruits of his extortion or the petitioners to the money involved in the present issue.

5. Rutkin had been indicted under 26 U.S.

court stated that "[a]n unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." 343 U.S. at page 137, 72 S.Ct. at page 575, 96 L.Ed. 833. It was further pointed out that the money was taxable as income notwithstanding the taxpayer's freedom to use it was assailable by someone with better title.

 We are of the opinion that the Tax Court correctly held the instant case to be controlled by Rutkin, not Wilcox, particularly in view of the gloss put on the Wilcox case by the Rutkin decision. Without indulging unnecessarily in ribbon matching it is manifest that the present appeal differs in several pertinent respects from the facts in Wilcox.

In the first place, although taxpayers here strenuously urge that the Kanns embezzled the money there is not, as the court below emphasized, any external evidence of that crime. They were never indicted or convicted of the alleged embezzlement, nor does it appear that those concerned with the corporate affairs of PCS or GSA, or anyone else, ever urged prosecution.[6]

Next, while it is clear that Wilcox' victim did not forgive or condone him, the Tax Court here found that there was "no adequate proof that the method if not the act has not been forgiven or condoned." The court further stated that the details of the supposed liability to repay[7] were "such as to leave serious doubt whether the whole project was not a false front erected to deceive not the corporation nor its stockholders but the Commissioner of Internal Revenue." To the extent that the above views involved questions of fact and an opportunity to observe G. H. and W. L. Kann, as well as other witnesses, on the stand, they should not lightly be disturbed. The court also properly pointed out that the testimony of the Kanns, "self-confessed

C. § 145(b) for wilfully attempting to evade and defeat taxes. His defense was that the money in question constituted his share of capital distributed on the dissolution of a corporation upon which capital gains taxes had been paid by others. (The United States conceded that Rutkin's failure to pay the capital gains taxes himself would not have provided a satisfactory basis for criminal charges). Under the court's charge Rutkin could only have been convicted if it was found that the money was extorted rather than paid under a claim of right. Rutkin having been convicted, the Supreme Court specifically accepted the finding of extortion.

6. It is petitioners' contention that the stipulations and other parts of the record show that they committed embezzlements within the meaning of the Pennsylvania Penal Code, 18 Purdon, Section 4827, and of the Ohio Code, Volume IV, Throckmorton's Ohio Code, Section 12467. While mere labels are not decisive it is noteworthy that the term "embezzlement" was not used in the minutes of the meeting of the board of directors of PSC, September 15, 1947, at which time the misconduct of G. H. and W. L. Kann was revealed. This misconduct was there referred to as an "unauthorized withdrawal by G. H. and W. L. Kann for their own use of certain funds belonging to the company." It does not appear that the Kanns' behavior was characterized as embezzlement by anyone, including petitioners, until the latter commenced this litigation.

7. At the September 15, 1947 meeting of the board of directors of PCS, supra, it was resolved that the corporation accept a joint demand note from the Kanns for the money owing to PCS. The note was without interest. Two and one-half months later the board of directors approved a loan of $12,500 to G. H. and W. L. Kann. On August 17, 1948, while G. H. Kann was serving a prison sentence upon a conviction based on his failure as president of PCS to file correct corporate tax returns, the stockholders, at a special meeting, resolved to grant him a leave of absence from July 1 to December 31, 1948, at his then current salary.

As to the $66,000 received by petitioners from G.S.A. there is nothing in the record to show an agreement to repay. As far as is shown the only indication that this sum was improperly received by the Kanns is a series of entries on the GSA books, such as "Accounts Receivable Special (G.H. and W.L. Kann)."

deceivers and defrauders, one of whom is an ex-convict",[8] was not entitled to any credence. See Quock Ting v. United States, 140 U.S. 417, 420–422, 11 S. Ct. 733, 35 L.Ed. 501.

The Tax Court made another relevant distinction between this case and Wilcox. In the latter decision the Supreme Court assigned as one of its reasons for voiding the deficiency the fact that should the Commissioner have succeeded the effect would have been to give the United States a prior lien over the claim of the victim to restitution. In the present case, said the Tax Court, "[p]etitioners are obviously in a financial position to make good such defalcations, if any, as their associates decide to recover."[9] We agree with respondent that if Wilcox is to be limited to its facts this aspect of the case assumes considerable stature.

The important distinctions between the Wilcox case and this appeal, however, concern the relationship of the taxpayers to their employers. As noted, whereas Wilcox was merely a salaried employee, the Kanns controlled PCS and GSA. The findings of fact clearly indicate that in all the years in question except 1936 the Kann family owned, directly or beneficially, at least 90% of the stock in PCS.[10] At all times here pertinent G. H. and W. L. Kann directly owned in excess of 20% of PCS stock. During this period management of the operations of PCS was confined solely to G. H. and W. L. Kann. GSA was, of course, a wholly owned subsidiary of PCS. It is thus readily apparent that but for the alleged embezzlements 90% of the money in question (less corporate taxes) would in the normal course of events have been returned to the family in the form of dividends [11] or capital. Unlike the situation in Wilcox, where the taxpayer would not have received the proceeds except for his conversion,

the Kanns were to a large extent taking their own money. Indeed, under the Pennsylvania and Ohio codes, supra Note 6, and bearing in mind the principles of corporate entity, it would seem to be possible for the proprietor of a one-man corporation to be guilty of embezzlement if he diverted corporate monies to his own pocket without the formality of declaring dividends. Such local law concept of embezzlement, while it may be useful to deter those in control of a corporation from defrauding creditors and minority stockholders, should not, in our opinion, be used as a vehicle for tax avoidance, absent a clear mandate to the contrary.

Finally, there is in the instant case another vital element, heretofore alluded to, which is absent from Wilcox: an independent showing of fraud with intent to evade and defeat income taxes. We refer to the omission from gross income in the tax returns during this period of the $151,015.50 in dividends from Steelblast Abrasives Company. This fact, entirely unrelated to any claimed wrongful taking, sheds light on the misappropriations of PCS and GSA funds and reveals them as but other pieces in this mosaic of tax evasion.

■■ There is likewise no merit to the argument of petitioners W. L. Kann and Stella H. Kann that they did not file a joint return for the years 1937 and 1938. Their contention is based on the fact that the wife did not sign the return nor was a power of attorney authorizing the husband to sign as agent for his wife included with the return for those years, as required by the applicable regulations. We agree with respondent that the latter are not mandatory but merely set forth a method of compliance and may be waived by the Commissioner. In this respect it is pertinent to note that Stella H. Kann was not called to testify and W. L. Kann did not while testifying

---

8. See Note 7, supra.

9. Petitioners dispute this finding but refer us to no contrary proof.

10. In 1936 the figure was only slightly less than 90%.

11. On which income taxes would also be paid.

contend that he signed the returns for his wife without her consent. Under the circumstances, the Tax Court having found as a fact that joint returns were filed we cannot say that this determination was clearly erroneous.

Petitioner Stella H. Kann further contends that absent a showing of fraud as to her she cannot be held liable for the 1937 and 1938 fraud penalties. We disagree. The Revenue Act of 1938, c. 289, 52 Stat. 447, 26 U.S.C.A. Int.Rev. Acts, page 1001 et seq.,[12] specifically provided for joint and several liability in the case of a husband and wife filing a joint return. This has been held to include liability for fraud penalties imposed on a wife who was not a party to her husband's fraud. Boyett v. Commissioner of Internal Revenue, 5 Cir., 1953, 204 F.2d 205; Howell v. Commissioner of Internal Revenue, 6 Cir., 1949, 175 F.2d 240. While the Revenue Acts prior to 1938 did not expressly provide for joint liability, it was decided in Moore v. United States, Ct.Cl.1941, 37 F.Supp. 136, that such liability attached under the earlier statutes. Although this interpretation of the pre-1938 Revenue Acts did not enjoy unanimous acceptance at the time of the Moore decision,[13] we are persuaded that the latter is correct and consonant with Congressional intent.[14]

The decisions will be affirmed.

KALODNER, Circuit Judge (dissenting).

The plain import of the majority's position is that it construes Commissioner v. Wilcox[1] to have been overruled by Rutkin v. United States,[2] although it paid lip service to Wilcox in attempting to distinguish its factual situation from that in the instant cases.

First, as to whether Rutkin overruled Wilcox:

I don't believe it did. Nor do I believe that the majority has the right to assume that it did. Like John Alden, the Supreme Court of the United States can and should speak for itself. Wilcox held in the plainest terms that embezzled money does not constitute taxable income to the embezzler. Until the Supreme Court tells us otherwise, we are required to follow Wilcox in embezzlement cases. It hasn't told us anything different since Wilcox. It is true that in Rutkin it distinguished between embezzled money and extorted money and held the latter to be taxable income. That circumstance is no reason why an inferior court should assume that Wilcox was overruled. Had the Supreme Court intended in Rutkin to overrule Wilcox it could, and undoubtedly would have said so. But the fact is that it did not and while it limited Wilcox "to its facts" it reiterated its holding in that case that

12. The pertinent part of the Act, Section 51(b), reads as follows:
"Sec. 51. Individual returns
* * * * * *
"(b) Husband and wife.—In the case of a husband and wife living together the income of each (even though one has no gross income) may be included in a single return made by them jointly, in which case the tax shall be computed on the aggregate income, and the liability with respect to the tax shall be joint and several. No joint return may be made if either the husband or wife is a nonresident alien."

13. See 37 F.Supp. 136, 141.

14. In H. Rep. No. 1860, 75th Cong., 3d Sess., pp. 29, 30; 1939–1 Cum. Bull.,

Part 2, 749, the change in Section 51 of the Revenue Act of 1938, supra note 12, was explained as follows:
"Section 51(b) of the bill expressly provides that the spouses, who exercise the privilege of filing a joint return, are jointly and severally liable for the tax computed upon their aggregate income. It is necessary, for administrative reasons, that any doubt as to the existence of such liability should be set at rest, if the privilege of filing such joint returns is continued."

1. 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L. Ed. 752.

2. 1952, 343 U.S. 130, 138, 72 S.Ct. 571, 576, 96 L.Ed. 833.

"There embezzled funds were held not to constitute taxable income to the embezzler under § 22(a)." [3]

On the score as to whether Rutkin overruled Wilcox, it is significant that in Alison v. United States [4] decided more than eight months after Rutkin [5] the Supreme Court cited Wilcox in support of its statement that *"One* whose funds have been embezzled *may pursue* the wrongdoer *and recover* his property * * *."* (Emphasis supplied.) [6]

Second. Is the factual situation in the instant cases distinguishable in its critical aspects from that in Wilcox?

The majority determined that there were these distinguishing factors:

(1) " * * * whereas Wilcox was merely a salaried employee, the Kanns (G. H. and W. L.) controlled PCS and GSA"; (2) in the taxable years concerned the Kann family owned 90% of the stock in PCS; (3) the two Kanns "directly owned in excess of 20% of PCS stock"; (4) "Unlike the situation in Wilcox, where the taxpayer would not have received the proceeds except for his conversion, the Kanns were to a large extent taking their own money"; (5) in Wilcox the embezzling taxpayer was prosecuted by his employer, convicted and jailed, while the Kanns were never prosecuted by PCS or GSA and were never indicted or convicted; (6) in Wilcox the embezzler's victim "did not forgive or condone him" while here there was no adequate proof on this score; and (7) in Wilcox the embezzler was unable to make restitution while the Kanns were able to do so.

In my opinion the asserted distinguishing factors are distinctions without a difference.

In Wilcox the embezzling bookkeeper was an employee. Here the two Kanns were just as much employees of PCS and GSA albeit they held top executive positions and received very substantial salaries.[7] The record shows that G. H. Kann owned 19% of the stock of PCS and W. L. Kann 6%.[8] Their direction of the affairs of PCS and GSA was by virtue of their employment and their service as directors,[9] and not because of their stock ownership. The statement that "The Kanns were to a large extent

---

3. 26 U.S.C. § 22(a).

4. 1952, 344 U.S. 167, 170, 73 S.Ct. 191, 192.

5. Rutkin v. United States was decided March 24, 1952; Alison v. United States was decided December 8, 1952.

6. The rationale of the Wilcox case was that the embezzler "received the money without any semblance of a *bona fide* claim of right" and was consequently "at all times under an unqualified duty and obligation to repay the money to his employer"; that "all right, title and interest in the money rested with the employer" and the embezzler "thus received no taxable income from the embezzlement." [327 U.S. 404, 66 S.Ct. 549] (Emphasis supplied.)

The rationale of the Rutkin decision was that the money which was extorted was given to him by its owner "in a manner which allows the recipient freedom to dispose of it at will".

7. G. H. Kann was President and General Manager of PCS and President of G.S.A. Salaries paid to him during the years 1936–1941 were:

| | PCS | GSA |
|---|---|---|
| 1936 | $21,700 | $12,000 |
| 1937 | 19,200 | 12,000 |
| 1938 | 24,000 | 12,000 |
| 1939 | 24,000 | 12,000 |
| 1940 | 24,000 | 12,000 |
| 1941 | 24,000 | 12,000 |

W. L. Kann was Secretary and Treasurer and Assistant General Manager of PCS and Vice-President of GSA. Salaries paid to him during the years 1936–1941 were:

| | PCS | GSA |
|---|---|---|
| 1936 | $14,500 | $9,000 |
| 1937 | 12,000 | 9,000 |
| 1938 | 15,000 | 9,000 |
| 1939 | 15,000 | 9,000 |
| 1940 | 15,000 | 9,000 |
| 1941 | 13,500 | 9,000 |

8. The record discloses that there were 25 members of the Kann family who owned stock in PCS. The family group owned 90% of PCS.

9. PCS had three directors in the years 1936–1939; G. H. Kann, W. L. Kann and Bertha F. Kann, their aged mother. It had five directors in 1940 and 1941; the three Kanns, T. W. Pangborn and A. Leo Weil, Jr.

taking their own money is entirely without basis. Between the two of them they only had a 25% stock interest in PCS. They had no interest at all in GSA.[10] The view expressed by the majority that the Kanns " * * * were never indicted or convicted of the alleged embezzlement * * * nor does it appear that * * * anyone * * * ever urged prosecution" and accordingly " * * * there is not * * * any external evidence of that crime (embezzlement)" suggests the startling concept that in order to constitute a crime there must exist the ingredients of prosecution, indictment and conviction. The same is true with respect to the majority's statement that in Wilcox the embezzler's victim did not condone his misconduct or forgive him. Also, utterly irrelevant to the issue as to whether the Kanns embezzled the money, was the question as to whether or not they could repay it.

The Tax Court disclosed an amazing dexterity in judicial legerdemain in determining these cases. It ignored the plain and unmistakable meaning of the word embezzlement and the essential elements of the crime of embezzlement. It ignored a stipulated record which demonstrated beyond any possible doubt that the two Kanns, in a most shameful abuse of the confidence reposed in them as executives and directors of their corporate employers, by means of crooked manipulation and financial juggling looted their employers of approximately $750,000.[11] The fact that they perpetrated their embezzlement on members of their own family group did not affect the legal significance of their conduct, but merely aggravated the enormity of their crime.

The Tax Court further ignored the stipulated facts that following discovery of the embezzlement late in 1942 by the PCS auditor, the latter, with the concurrence of the Kanns noted upon the books of PCS their indebtedness to PCS in the amount of the embezzled funds, and that the Kanns later made restitution to PCS of $251,000 and to GSA of $45,000, and, in addition executed a note to PCS covering their embezzlement and assigned all their stock in PCS as collateral for their obligation.

Not only did the Tax Court ignore the stipulated facts establishing the embezzlements but it also ignored the uncontradicted sworn testimony of both the Kanns at the hearing that they had "stolen" the embezzled funds and had done so "without any claim of right." [12]

It did so despite the fact that Mr. Dickinson, government counsel, had stated at the Tax Court hearing that he was not challenging the credibility of the Kanns or any of the witnesses testifying as to their embezzlement.[13]

---

10. All of the stock of GSA was owned by PCS.

11. $675,000 from PCS and $75,000 from GSA.

12. Following is an excerpt of the cross examination of G. H. Kann by Mr. Dickinson, counsel for the Commissioner:
"Q. Now, as I understand your position in your petition, the allegations of facts in the petition, and the testimony you have given on direct examination, your position is that *you appropriated* the funds of Pittsburgh Crushed Steel Company and Globe Steel Abrasive Company to your own use *without any claim of right to it;* is that right? A. That is correct.
"Q. In other words, your position is that you *stole* this money from the corporation? A. We obtained the money in a surreptitious manner and took the money *without any right.*
"Q. *You stole it?* A. That is correct." (emphasis supplied)
Following is an excerpt of the cross examination of W. L. Kann, by Mr. Dickinson, counsel for the Commissioner:
"Q. Now, as I understand your position, both in your petition and in the testimony you have given on direct, it is that in the years 1936 to 1941 you appropriated the funds of both these companies, Pittsburgh Crushed Steel Company and Globe Steel Abrasive Company, to your own use, you and your brother, *without any claim of right* to those moneys, is that right? A. Yes, sir." (emphasis supplied)

13. "Mr. Dickinson: I will say this: that in so far as any of Mr Cleary's witness-

In my opinion the Tax Court committed reversible error when it (1) failed to find as a fact that the Kanns had, without any bona fide claim of right, fraudulently taken and converted to their own use money belonging to PCS and GSA and (2) when it failed to find as a matter of law that the Kanns' conduct constituted embezzlement and that under the Wilcox decision the moneys which they had embezzled were not taxable income.

The government's contention that despite the fact that the Kanns "surreptitiously procured for their own use funds from family owned corporations" [14] the funds so taken were not embezzled is, to say the least, ingenious. "Surreptitiously procured" is undoubtedly more euphonious and less grating on the embezzler's ear; but embezzlement, called by any other name, is still embezzlement.

The view which I have expressed makes it unnecessary to discuss the issues as to (1) whether Stella H. Kann filed a joint income tax return with her husband W. L. Kann for the years 1937 and 1938 and (2) whether, for either of such years, she is liable for a fraud penalty. I should like to note, however, that I am of the opinion that the returns were not joint [15] and even if they were that there is no liability on the part of Mrs. Kann for a fraud penalty since the government failed to discharge its affirmative burden of proof with respect to any fraudulent intent on her part to evade tax.

For the reasons stated I would reverse the decisions of the Tax Court.

On Petition for Rehearing.

PER CURIAM.

An examination of the petition for rehearing discloses no point which was not considered by the court. The petition for rehearing therefore will be denied.

KALODNER, Circuit Judge, dissents.

---

es have testified with respect to the manner in which these falsifications with respect to the Pittsburgh Crushed Steel Company and Globe Steel Abrasive Company were done, I do not attack their credibility, and I will state that for the record."

\*　　\*　　\*　　\*　　\*　　\*

"Mr. Cleary (counsel for Kanns): In view of Mr. Dickinson's statement that in his attack on the credibility he is not attacking the statements made by the Messrs. Kann respecting the manner in which the records were kept in their working out of these falsifications, I do not think that I shall need the testimony of Mr. Casey."

14. In its brief the government stated:
 "During the taxable years 1936 through 1941, the taxpayers, who were the principal officers of family-owned corporations, who managed and conducted the affairs of the corporations, and who, by proxies and other arrangements, had voting control, surreptitiously withdrew large sums of money from the corporations for their own use and benefit."

15. Cf. McCord v. Granger, 3 Cir., 1952, 201 F.2d 103.