**Minette S. MACIAS, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 12219.**

United States Court of Appeals
Seventh Circuit.

May 7, 1958.

Malcolm K. Whyte, Milwaukee, Wis., John L. Palmer, Robert V. Abendroth, Milwaukee, Wis., Attys. (Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., of counsel), for petitioner.

Charles K. Rice, Asst. Atty. Gen., Tax Division, John J. McGarvey, Atty., U. S. Dept. of Justice, Washington, D. C., Lee A. Jackson, Joseph F. Goetten, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, MAJOR and HASTINGS, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition for review of a decision of the Tax Court, entered September 23, 1957, sustaining the Commissioner's determination of deficiencies in income tax in the amount of $3,460.88, for the years 1948 and 1949, with the addition of penalties, under Secs. 293(b) and 294(d) of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 293(b), 294(d).

There are two contested issues: (1) whether certain payments received by Arturo Macias (former husband of petitioner) from Georg Warschawski during the years 1948 and 1949 constitute taxable income, and (2) whether there is substantial evidence to support the Tax Court's finding that the joint returns filed by Arturo and petitioner for 1948 and 1949 were false and fraudulent, made with the intent to evade taxes.

It appears pertinent to recite the material evidentiary facts found by the Tax Court. Petitioner, Minette S. Macias, is and has been for many years a resident of Milwaukee, Wisconsin. She and her former husband, Arturo C. Macias, filed joint income tax returns for 1948 and 1949. Petitioner was divorced from Arturo in 1954. On March 11, 1955, the Commissioner sent a joint notice of deficiencies for the years in question to Minette and Arturo at their last known address. Arturo did not petition the Tax Court for a redetermination of the deficiencies. Accordingly, the full amount thereof, together with penalties, was assessed against him. This assessment was subsequently abated as uncollectible.

Arturo was employed by Lakeside Laboratories, Inc., from January 1, 1940 until March 28, 1953. In 1945 he became vice president of two newly formed subsidiaries of that firm, namely, Lakeside Export Corporation (hereafter referred to as Export) and Lakeside International Corporation. As such, he conducted the business of the subsidiaries under the direction of their president, Evan P. Helfaer. Export was engaged in the sale of ethical drugs in the Western Hemisphere, including Mexico.

At all times material, the exclusive independent distributor for the products of Export in Mexico was Farmaceuticos Lakeside, S. A. (hereafter referred to as Farmaceuticos), the president, manager and sole owner of which was Georg Warschawski. During the years 1943 to 1953, Export sold pharmaceutical products to Farmaceuticos. The sales agreements were negotiated by Arturo, as agent for Export, with Warschawski. The prices quoted to Farmaceuticos were fixed by Arturo under the direction and with the approval of Helfaer.

In 1943 Arturo entered into a personal side agreement with Warschawski, whereby he was to receive a 2% payment from Farmaceuticos for all sales from Export to Farmaceuticos. In 1947 this payment was reduced to 1% and during the years 1948 and 1949 it was further reduced to one-half of 1%. During the years 1948 and 1949 Arturo received payments of $4,895.20 and $5,001.35, respectively, pursuant to this arrangement. During the period from 1943 until June 1952, Arturo received sums aggregating some $24,000, under the side agreement with Warschawski. These sums were sometimes paid in cash to Arturo and sometimes by check. So far as Warschawski was concerned, the payments were made to Arturo in order to secure an exclusive contract for the sale of Lakeside pharmaceuticals by Farmaceuticos

in Mexico, with the hope that lower prices would be charged.

The amounts paid by Warschawski to Arturo, personally, were not included in the billings made by Export for sales to Farmaceuticos and were not part of the purchase price of the merchandise. The side payments made to Arturo by Warschawski were not authorized by Helfaer and Export had no knowledge or reason to believe that Arturo was receiving side payments from Farmaceuticos.

In 1952 Warschawski made a business trip to Milwaukee and for the first time informed Helfaer that Arturo had been paid side money or a "mordida" (as the payments were termed by Warschawski). Helfaer then instructed Warschawski to cease making any payments to Arturo and indicated his disapproval of the practice. Warschawski thereupon discontinued making such payments. On March 30, 1953, while Arturo was in Europe, he was discharged by Helfaer.

During all times here pertinent, Export was insured against losses caused by the dishonest acts of its employees. Under the terms of the policy, the insurer (American-Associated Insurance Company) was obligated to protect Export against the dishonest acts of its employees and to reimburse the employer for the loss of funds occasioned by misappropriation. After obtaining sufficient evidence of Arturo's dishonesty, Export filed notification and formal proof of loss with its insurer. Losses were claimed in the amount of $54,883.67 under the dishonesty coverage of the policy, of which amount $24,885.48 was claimed as recoverable because of the funds received by Arturo from Farmaceuticos. The entire claim was settled for $15,000, with a sight draft which stated that the settlement was "in full settlement and satisfaction of any and all liability for the loss resulting from the acts of Arturo C. Macias." It appears that of the amount received in settlement of the claim, Export received $7,648.40 in full satisfaction of the insurer's liability under the policy, the balance being paid to International.

The side payments made by Warschawski to Arturo were in large part deposited by the latter in one or more personal bank accounts, the existence of which was unknown to petitioner. Petitioner had no knowledge of any dishonest acts perpetrated by her husband until advised by his employer in March 1953. The side payments were not reported for federal income tax purposes.

The joint income tax returns of Arturo and petitioner for the taxable years 1948 and 1949 included no income of petitioner, and the statutory notice of deficiency included no income of petitioner. The Commissioner determined that the payments received by Arturo from Farmaceuticos constituted income to Arturo.

Arturo, shortly after his discharge by Helfaer, abandoned petitioner and their children and went to Mexico, where presumably he still resides. Prior thereto, he conveyed certain property to petitioner for the benefit of her and their children. On May 14, 1954, petitioner was awarded a divorce from Arturo by the Circuit Court for Milwaukee County, Wisconsin. The divorce decree awarded custody of the children to petitioner and recited that the parties had previously made a property settlement (describing the property involved).

 Relative to the first issue, petitioner contends that the payments received by Arturo were embezzled funds and, therefore, not taxable, under the decision of Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752. Reliance is placed upon the definition of "embezzlement" contained in Sec. 343.20(1) of the 1947 Wisconsin Statute. It is hardly open to question but that Arturo illegally received payments from Warschawski. Whether such payments constituted embezzlement under the Wisconsin law or any other is doubtful. (In this connection, in fairness to petitioner it should be stated that there is evidence in the record more favorable to petitioner than is shown in the evidentiary findings of the Tax Court heretofore recited.) However, we need

not indulge in a discussion of this issue because, as petitioner concedes, it is an issue of fact. Such issue was by the Tax Court found adversely to petitioner. We discern no reason to disagree, and we accept the finding. In this connection, petitioner further argues with some plausibility that the payments received by Arturo, however they be characterized, were not required to be reported under the "claim of right" doctrine promulgated in Wilcox.

We need not pursue this contention, in view of the subsequent decision in Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, in which the Court held as taxable income, money obtained by extortion. In doing so the Court, while not expressly so stating, evidently repudiated the so-called "claim of right" doctrine embraced in Wilcox. Otherwise, the Court could not have reached the result which it did in Rutkin. The decision in the latter case rests squarely upon the pronouncement (343 U.S. at page 137, 72 S.Ct. at page 575):

"An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. [Citing cases.] That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it."

If this reasoning had been employed in Wilcox, we see no escape from the conclusion that the decision in that case would have been different. In our view, the Court in Rutkin repudiated its holding in Wilcox; certainly it repudiated the reasoning by which the result was reached in that case. If that is what the Court intended, it is unfortunate that it did not so state because much confusion has been engendered by the decision, as is evidenced by the many cases where the courts have been called upon to reconcile Rutkin with Wilcox.

Our view that Wilcox was emasculated by Rutkin is not weakened by the Court's statement in the latter case (343 U.S. at page 138, 72 S.Ct. at page 576):

"We do not reach in this case the factual situation involved in Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752. We limit that case to its facts. There embezzled funds were held not to constitute taxable income to the embezzler under § 22 (a). The issue here is whether money extorted from a victim with his consent induced solely by harassing demands and threats of violence is included in the definition of gross income under § 22(a)."

We are not able to comprehend how the recipient of embezzled funds has any greater or different "claim of right" than the recipient of money obtained by extortion. In either case the money is unlawfully obtained, does not by right belong to the recipient and may be recovered by the person lawfully entitled thereto. Our view that the Court in Rutkin emasculated Wilcox, and particularly the reason by which the result was reached in the latter case, places us in distinguished company. In Rutkin, four members of the Court dissented. Mr. Justice Black, writing for such dissenting members, referring to Wilcox stated (343 U.S. at page 139, 72 S.Ct. at page 577):

"We there pointed out that the embezzler had no bona fide legal or equitable claim to the money, was under a definite legal obligation to return it to its rightful owner, and consequently had no more received the kind of 'gain' or 'income' which Congress has taxed than if he had merely borrowed money. One who extorts money not owed him stands in this precise situation. He has neither legal nor equitable claim to the extorted money and is under a

continuing obligation to return it to its owner. [Citing cases.] A comparison of Mr. Justice Burton's opinion in this case with his dissent in the Wilcox case reveals beyond doubt that the Court today adopts the reasoning of his prior dissent, thereby rejecting the Wilcox interpretation of § 22(a). A tax interpretation which Congress has left in effect for six years is thus altered largely as a consequence of a change in the Court's personnel."

In our judgment, Rutkin leaves nothing of Wilcox but the shell, the substance has been removed. In any event, there is a marked distinction between the facts of Wilcox and here. In that case, the facts disclosed without controversy a conventional type of embezzlement. A bookkeeper authorized to receive and collect money on behalf of his employer converted large sums to his own use. In the instant case, it is hardly open to doubt but that Arturo committed some sort of criminal offense. Whether it amounted to embezzlement is controversial and doubtful. The Tax Court has resolved that controversy by finding that his acts did not constitute embezzlement. We accept that finding, from which it follows that we must approve the holding of the Tax Court that the payments received by Arturo constituted taxable income.

This brings us to the fraud issue, on which the Tax Court also sustained the determination of the Commissioner that the returns for the taxable years filed by Arturo and petitioner were false and fraudulent, made with the intent to evade taxes. The issue here is whether that finding is supported by substantial evidence.

It is well to note that the presumption of correctness which usually attaches to a determination by the Commissioner is not applicable. Congress, on the issue of fraud, has placed the burden of proof upon the Commissioner. Section 1112 of the Internal Revenue Code of 1939 provides:

"In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade taxes, the burden of proof in respect of such issue shall be upon the Commissioner."

It is not contended that petitioner committed any fraud; in fact, it is conceded that she had no knowledge of the payments received by Arturo prior to the time of his discharge in 1953. It is conceded that she had no income and that the income reported in the joint returns was solely that of Arturo. Under these circumstances, the assessment of penalties against her, based on her asserted fraudulent act in signing the returns, is shockingly harsh. It was concluded by the Tax Court, and is argued here, that such result is required under Sec. 51(b)(1) of the Internal Revenue Code of 1939, which, referring to a joint return made by a husband and wife, provides:

"If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."

Three cases are cited in support of the contention that where joint returns are filed it is immaterial whether fraud is attributed to the husband or the wife, or both, since the liability is joint and several. Kann v. Commissioner, 3 Cir., 210 F.2d 247, 252; Boyett v. Commissioner, 5 Cir., 204 F.2d 205, 209; Howell v. Commissioner, 6 Cir., 175 F.2d 240, 241. The courts in these cases held that the language of the joint return provision plainly made both parties liable for penalties as well as the tax. We think there is serious doubt as to whether the provision is reasonably susceptible of such construction. (See dissenting opinion of Judge Kalodner in Kann v. Commissioner, 3 Cir., 210 F.2d 247, 255.) The provision makes no mention of a penalty but refers only to the tax. It would seem to us that "the liability with respect to the tax" does not include a liability with respect to the penalty, which is a separate item from the tax and which is assessed because of fraud. We need

not decide, however, or base our decision upon an interpretation of the joint return provision, for the reason subsequently disclosed.

█ █ We assume, without deciding that a fraud penalty may be properly assessed against either or both the husband and wife making a joint return, for a fraud committed by either. We then come to the question as to whether the failure of Arturo to report the income in question was fraudulent, with the intent to evade taxes. In our view, this finding was not substantially supported and rests on conjecture and suspicion. The main proof relied upon is the mere fact that the payments received by Arturo were not reported. It is suggested that his conduct revealed a pattern in that similar payments were received over a course of years. There is no proof, however, as to whether such payments were reported in other years, either those before or after the taxable years in controversy. The Wilcox case was decided in 1946. Under that decision Arturo or any taxpayer had a right to think that the payments received by him did not constitute reportable income. In fact, absent Rutkin, we doubt if there would be any contention to the contrary on the part of the Commissioner. It is suggested that there is no proof that Arturo relied upon Wilcox. This argument ignores the burden of proof cast upon the Commissioner. Moreover, there is an elementary rule, ofttimes invoked by the government, that the citizen is presumed to know the law. We think petitioner should have the benefit of that presumption, particularly in view of the fact that Arturo was absent from the proceeding and that petitioner had no means of procuring his presence. It is intimated that Arturo's sudden departure from this country is a circumstance to be considered. In our view, it means nothing in relation to his failure to report income. So far as the record shows, there was no investigation pending at that time as to his tax situation; that commenced months later. He had been discharged for his dishonest acts only a few days before he departed, he had wrongfully exacted payments from Warschawski, and he had marital troubles which culminated shortly after in a divorce. Under these circumstances there is not the slightest basis for an inference that his departure was because of his failure to report income.

The Commissioner in his argument is hardly consistent in his characterization of Arturo. When discussing the issue of embezzlement he speaks of Arturo in complimentary terms, in fact goes so far as to state that the payments in controversy were legally received by him. In contrast, on the issue of fraud, Arturo is depicted as a villain who by his dishonest acts committed a fraud against Warschawski, as well as his employer and petitioner. From this conduct the inference is drawn that he also committed the income tax fraud. This inference is of doubtful validity, certainly falls far short of meeting the burden imposed on the Commissioner.

In Davis v. Commissioner, 10 Cir., 184 F.2d 86, at page 87, 22 A.L.R.2d 967, the Court, in refusing to accept the finding of the Tax Court on the issue of fraud, stated:

"Fraud implies bad faith, intentional wrongdoing and a sinister motive. It is never imputed or presumed and the courts should not sustain findings of fraud upon circumstances which at the most create only suspicion."

In our judgment, the Commissioner did not carry his burden of proof on the issue of fraud. We so hold. It follows that the decision of the Tax Court is affirmed in part and reversed in part, and the cause is remanded for a redetermination of deficiencies in accordance with this opinion.