Estate of Isaac Stromberg, Deceased, Milton Stromberg, Executor v. Commissioner.
Estate of Stromberg v. Commissioner
Docket No. 63870.
United States Tax Court
T.C. Memo 1962-246; 1962 Tax Ct. Memo LEXIS 60; 21 T.C.M. (CCH) 1310; T.C.M. (RIA) 62246; October 23, 1962
*60 Sherman N. Rosen, Esq., and Thomas J. Carens, Esq., for the petitioner. J. Frost Walker, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax and additions to tax under section 293(b), I.R.C. 1939, for the years 1943 through 1947 as follows (including victory tax for 1943): Addition
Year
Tax
to tax
1943
$ 3,164.38
$ 1,582.19
1944
9,470.48
4,735.24
1945
10,503.18
5,251.59
1946
31,960.09
15,980.04
1947
2,555.33
1,277.66
The questions presented for determination are: (1) whether any part of the deficiency for any year is due to fraud with intent to evade tax; (2) whether the statute of limitations is thus inapplicable to bar any or all of the deficiencies; (3) if not, as to 1946, whether the omission from income exceeded 25 percent of the gross income stated in the return so as to validate consents to extensions of time for assessment executed more than three but less than five years after the return was filed; and (4) whether, if assessment is timely, respondent correctly determined the deficiencies. Findings of Fact Some of the facts *61 have been stipulated and are hereby found accordingly. Isaac Stromberg (hereinafter referred to as decedent), who died February 16, 1955, filed a timely Federal income and victory tax return for the taxable year ended December 31, 1943 and timely Federal income tax returns for the taxable years ended December 31, 1944, 1945, 1946 and 1947 with the collector of internal revenue, Boston, Massachusetts. Petitioner is decendent's estate. A series of consents extending the period of limitations upon the assessment of decedent's income tax for taxable year 1946 through June 30, 1956 were executed, beginning on February 28, 1952. Decedent's 1946 return was filed on March 15, 1947. Decedent was the treasurer of Commonwealth Clothing Company (hereinafter referred to as Commonwealth), a Massachusetts corporation engaged in the manufacture of men's and boys' coats, from 1938 to 1947. Prior to 1938, he was the president and principal stockholder of Commonwealth, but in that year he transferred controlling stock interest to his son, Milton Stromberg. During the taxable years involved here, Milton Stromberg was president and owned all 700 shares of capital stock of Commonwealth except that *62 on June 20, 1946 an additional 200 shares were issued to decedent. Decedent was the "inside man," supervising the general operation of Commonwealth. Among other duties, he had charge of Commonwealth's books and bought some supplies. Decedent was eccentric, impulsive, and secretive in his activities. Milton Stromberg was the "outside man," or salesman, for Commonwealth. In this capacity, he traveled extensively and was away from the place of business frequently and sometimes for several months at a time. He was not familiar with the affairs of Commonwealth or with his father's activities in regard to it. In his returns for the taxable years 1943 through 1947, decedent reported gross income and sources thereof as follows: Year
Source
Amount
1943
Salary from Commonwealth
$ 8,840.00
Salary from Clifton Clothing,
Baltimore, Md.
4,000.00
$12,840.00
1944
Salary (unstated source)
$ 8,840.00
1945
Salary from Commonwealth
$ 8,840.00
1946
Salary from Commonwealth
$15,600.00
Dividends
211.50
$15,811.50
1947
Salary from Commonwealth
$15,600.00
Dividends
550.00
Interest
190.40
$16,340.40
Decedent deposited in his checking *63 account with the Pilgrim Trust Co., Boston, Massachusetts, now known as New England National Bank, during the years 1943 through 1947, amounts as follows: Number of
Total de-
Year
deposits
posits
1943
67 (129 items)
$25,793.28
1944
95 (227 items)
38,520.99
1945
78 (260 items)
41,407.62
1946
105 (371 items)
87,337.67
1947
83 (313 items)
72,588.83
An analysis of decedent's checking account, prepared by a firm of Certified Public Accountants from the ledger sheets of the account, identified certain of the deposits, including salary payments and other reported or nontaxable receipts such as repayment of short-term loans made by decedent and proceeds from the sale of securities. Some income reported by decedent was not identified among the deposits. The accountants were unable to make any identification of deposits totaling as follows: "Unidentified"
Year
deposits
1943
$ 5,930.90
1944
18,550.63
1945
19,914.12
1946
54,778.57
1947
18,402.76
Among the deposits in decedent's account which were classified as "unidentified" by the accountants were certain checks delivered by various makers to Commonwealth in payment for *64 merchandise purchased from it by the makers. These checks were endorsed in the name of Commonwealth and in the name of decedent. The total number and amount of the checks so established for each year are as follows: Number of
Total
Year
checks
amount
1943
1944
1
$ 26.50
1945
3
241.75
1946
20
2,067.80
1947
27
1,523.75
$3,859.80
The number of checks written by decedent and the beginning and ending balances in his account for each of the years involved here are as follows: Balance on
Number
Balance on
Year
January 1
of Checks
December 31
1943
$ 6,637.87
294
$ 3,076.31
1944
3,076.31
288
10,833.40
1945
10,833.40
301
8,567.72
1946
8,567.72
327
5,447.05 *
1947
5,447.05
312
18,615.34 **
During the period involved here, fictitious purchases of merchandise from the Joseph Ryack *65 Coat Front Company, one of Commonwealth's suppliers, were arranged by decedent, who received the payments made by Commonwealth for such fictitious purchases. In 1947, after an audit of Commonwealth's books and in response to statements made to him by his own accountant and by Milton Stromberg that "[if] you have taken any money from [Commonwealth], you ought to put it back," or words to that effect, decedent repaid $17,252.76, which was credited to sales on the books of Commonwealth for that year. In the statutory notice of deficiency, respondent has reduced the claimed unreported income in 1947 by the $17,252.76 which decedent returned to Commonwealth. In an affidavit executed in 1954, decedent stated, in part that between the years 1942 and 1947 I wrongfully withdrew certain funds from [Commonwealth] by means of fictitious corporate purchases; that in the years 1946 and 1947 I wrongfully withdrew funds from said corporation by means of cash sales of merchandise belonging to said corporation, which sales were not recorded on the books of account of said corporation; that the amount of such fictitious purchases and unrecorded cash sales did not exceed $17,000.00 in their *66 entirety; that in 1947, * * * I voluntarily disclosed to said corporation the fact of such fictitious purchases and unrecorded cash sales, and in said year reimbursed said corporation therefor by returning to it the sum of $17,000.00, which amount represented my best estimate of the total funds wrongfully withdrawn by me from said corporation; * * * Decedent's affidavit further stated that he had not wrongfully withdrawn any other funds from Commonwealth and that any other funds deposited in his checking account in the Pilgrim Trust Company during the years involved came from "sources other than said corporation." The statutory notice of deficiencies in tax and additions to tax was mailed to petitioner on May 25, 1956. The deficiency determined for each year is due to the following adjustments: Net
Income
Unreported
Net
Year
Reported
Income
Adjustment
1943
Income tax
$11,450.91
$ 6,930.00
$ 6,930.00
Victory tax
11,989.48
6,930.00
6,930.00
1944
8,340.00
18,551.43
18,551.43
1945
7,300.17
19,914.12
20,657.12 *
1946
14,747.86
50,705.69
50,705.69
1947
13,638.00
5,995.70
5,671.76 **
*67 Unreported income is explained in "Exhibit 'A'" of the deficiency notice as follows: Computation of Income Unreported from Commonwealth Clothing Company
1943
1944
1945
1946
1947
Unidentified deposits
$5,930.00
$18,550.63
$19,914.12
$54,778.57
$18,402.76
Less proceeds of fictitious purchases
deposited
2,557.00
3,450.00
Unidentified deposits alleged to con-
stitute proceeds of unreported sales
$5,930.00
$15,993.63
$16,464.12
$54,778.57
$18,402.76
Other Adjustments
Fictitious purchases
1,000.00
2,557.80
3,450.00
960.00
Travel expense
2,732.17
3,885.70
Totals
$6,930.00
$18,551.43
$19,914.12
$57,510.74
$23,248.46
Less amounts set up as accounts re-
ceivable
6,805.05
Less income restored
17,252.76
Unreported income
$6,930.00
$18,551.43
$19,914.12
$50,705.69
$ 5,995.70
During the years involved here, decedent withdrew funds from Commonwealth by means of fictitious corporate purchases. During the years 1944 through 1947, decedent withdrew funds from Commonwealth by means of sales of merchandise belonging to the corporation, which sales were not recorded on the books of the corporation *68 and the proceeds of which were deposited in decedent's checking account. During the years involved here, decedent reported on his tax returns only the amounts received from Commonwealth as salary and did not report the amounts which he otherwise withdrew from the corporation. Opinion There is ample evidence to support respondent's burden of proof that decedent illegally withdrew funds from the corporation during the years in controversy. Respondent uses such words as "stole" or "stolen" to describe the operation. There is equally strong evidence that the controlling stockholder of the corporation had no knowledge of these actions at the time and that, even afterward, he had no information as to the amounts. It may well be surmised that his relationship to decedent might have caused him to "condone" the defalcation. W. L. Kann, 18 T.C. 1032 (1952), affd. 210 F. 2d 247 (C.A. 3, 1953), certiorari denied 347 U.S. 967 (1954). But the burden is on respondent and there is no evidence that he did so. Except for the existence of a family relationship, the facts are indistinguishable from the Wilcox case, [1] where the illicit possessor of the funds *69 was likewise in complete control of their disposition and had entire dominion over them until his offense was discovered. The difficulty with finding fraud in such a case as this is that for 15 years an almost unanimous [2] Supreme Court was of the opinion that embezzled funds were not properly includible in taxable income. James v. United States, 366 U.S. 213 (1961). And although the Wilcox case, supra, dealt only with the year 1945 and those following, the existence of such a point of view by the Nation's highest court seems to us to be equally applicable to the years immediately preceding. See, e.g., McKnight v. Commissioner, 127 F. 2d 572 (C.A. 5, 1942), reversing 43 B.T.A. 221 (1941). While the issue is not free from doubt, we think respondent has failed to sustain his burden of showing that decedent fraudulently failed to report this income, even though he obtained it by withdrawing funds to which the corporation was entitled without knowledge *70 or subsequent acquiescence by the majority stockholder. As to all the years, except 1946, we accordingly conclude that both the addition to tax for fraud and the removal of the bar of the statute of limitations have not been adequately shown by respondent. The determination of the deficiency for these years is accordingly disapproved. As to the year 1946, we reach a similar conclusion. The statute of limitations is a bar unless respondent shows that decedent failed to include in the reported income for that year 25 percent or more of the amount properly reportable as gross income.[3] Although the James case, supra, concluded that Wilcox, supra, prevented the imposition of the sanctions imposed for fraudulent underreporting, it leaves no doubt that the proceeds of embezzlement were from the beginning properly includible in the embezzler's income.[4]Section 275(c), I.R.C. 1939, speaks in terms not of fraud but of improper exclusion from gross income. And it might well originally have been concluded that respondent's evidence to sustain his burden under section 275(c) may rest on allocations or assumptions and that it does not require the same "clear and convincing evidence" *71 nor the rejection of all contrary inferences, cf. W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958), as does a sanction for such acts of moral turpitude as intentionally defrauding the United States. This is particularly true considering that the 5-year statute was specifically invoked to encompass "an honest mistake." [5]
*72 But we view the authorities as by now precluding any such approach. The burden on respondent appears to eliminate "an assumption as a substitute for direct evidence" under section 275(c) similar to what we have held under the fraud provisions. H. A. Hurley, 22 T.C. 1256, 1265 (1954), affirmed other issues 233 F. 2d 177 (C.A. 6, 1956). See also Jacobs v. United States, 131 Ct. Cl. 1, 126 F. Supp. 154 (1954). And respondent has no more shown that the unreported income for 1946 was 25 percent of decedent's gross income than that he fraudulently failed to return his embezzled income for other years. As our findings show, the only unreported income that can definitely be established as attributable to 1946 is $2,067.80, a figure considerably less than one quarter of the $15,811.50 which decedent returned as gross income. And even the determination of unreported income for 1946 is less than the so-called unidentified bank deposits and includes a presumably excessive deduction of $2,732.17 for travel expense, which, while it might increase the assertedly fraudulent understatements, cannot be considered an omission from "gross income." H. A. Hurley, supra. *73 For the reasons stated, Decision will be entered for petitioner. Footnotes
*. Among withdrawals were $ 10,000 withdrawn on December 27, 1946 and $ 10,000 withdrawn on December 30, 1946. ↩
**. Among deposits were $ 5,821.46 deposited on January 31, 1947, $ 10,000 deposited on February 5, 1947, and $ 17,842.91 deposited on December 31, 1947. The amount of $ 17,252.76 was withdrawn on December 31, 1947.↩
*. Reflects unallowable deduction for medical expenses of $ 743.00. ↩
**. Reflects increased deduction for contributions of $ 323.94.↩
1. Commissioner v. Wilcox, 327 U.S. 404↩ (1946). 2. The sole dissent was filed by Mr. Justice Burton, who was not a member of the Court when the James case was decided.↩
3. Internal Revenue Code of 1939. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. ↩
4. "* * * A gain 'constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.' Rutkin v. United States * * *. Under these broad principles, we believe that petitioner's contention, that all unlawful gains are taxable except those resulting from embezzlement, should fail. "* * * This standard brings wrongful appropriations within the broad sweep of 'gross income' * * *
"* * * We should not continue to confound confusion, particularly when the result would be to perpetuate the injustice of relieving embezzlers of the duty of paying income taxes on the money they enrich themselves with through theft while honest people pay their taxes on every conceivable type of income." James v. United States, supra, 366 U.S. at 219, 221↩. 5. "The present law permits the Government to assess the tax without regard to the statute of limitations in case of failure to file a return or in case of a fraudulent return. The House bill continues this policy, but enlarges the scope of this provision to include cases wherein the taxpayer understates gross income on his return by an amount which is in excess of 25 per cent of the gross income stated in the return. Your committee is in general accord with the policy expressed in this section of the House bill. However, it is believed that in the case of a taxpayer who makes an honest mistake, it would be unfair to keep the statute open indefinitely. * * * Accordingly, your committee has provided for a 5-year statute in such cases. * * *" S. Rept. 558, to accompany H.R. 7835 (Pub. L. 216), 73d Cong., 2d Sess., pp. 43-44 (1934).↩