Herman H. Chester and Martha Chester v. Commissioner.
Chester v. Commissioner
Docket No. 3274-65.
United States Tax Court
T.C. Memo 1967-50; 1967 Tax Ct. Memo LEXIS 212; 26 T.C.M. (CCH) 246; T.C.M. (RIA) 67050; March 17, 1967
*212 The petitioner in 1956 and 1957 was engaged in both the legal practice of medicine and the illegal performance of abortions, and maintained several savings accounts under assumed names in which he deposited large amounts of cash. Held, that petitioners have failed to show error in the respondent's determination that the deposits so made constituted taxable income earned in such years. Held, further, that some part of the underpayment in tax for each year was due to fraud and that the petitioners are jointly and severally liable for additions to tax pursuant to section 6653(b) of the Internal Revenue Code of 1954. Joseph Steinberg, 277 Broadway, New York, N. Y., and Donald Steinberg, for petitioners. Charles M. Costenbader, for respondent. ATKINS
Memorandum Findings of Fact and Opinion
*214 ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1956 and 1957 in the respective amounts of $51,326.11 and $107,358.81, and additions thereto under section 6653(b) of the Internal Revenue Code of 1954 in the respective amounts of $25,663.06 and $58,383.41. The issues are whether the petitioners omitted substantial amounts of income from their income tax returns for the taxable years in question; whether the respondent erred in disallowing a portion of claimed business expenses; and whether any part of any deficiency for either year is due to fraud. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioners are husband and wife residing in Brooklyn, New York. On April 10, 1957, they filed a joint Federal income tax return for the taxable year 1956 with the district director of internal revenue, Brooklyn, New York, reporting a tax liability of $5,814.31. On October 15, 1958, they filed with such district director a tentative joint return (which purported to show only estimated income and deductions) for the taxable year 1957 in which they reported a tax *215 liability of $6,534. [1] Thereafter, on May 28, 1959, they filed with such director a joint return for the taxable year 1957 showing a tax liability of $9,635. The petitioner Martha Chester is a party herein only by reason of having filed joint returns with her husband, and the latter will hereinafter be referred to as the petitioner. The petitioner was born in 1896. He was licensed to practice medicine in 1922, and during the taxable years 1956 and 1957 he conducted a business as a physician at his residence. During the taxable years 1956 and 1957 the petitioner performed many illegal abortions for which he received fees in varying amounts. In July or August 1956, he hired a woman to assist him while he was performing abortions. On August 8, 1957, the petitioner was arrested by local authorities and subsequently pleaded guilty under two indictments charging him with illegal abortion. He served 8 months in prison beginning in August 1958. His license to practice medicine was revoked in December 1958. During the year 1957 following his arrest *216 on August 8, the petitioner performed no illegal abortions. At the time of his arrest the petitioner had several thousand dollars in cash in his home. On the day of his arrest the petitioner made a statement to the assistant district attorney, Kings County, New York, that he commenced performing abortions about 14 or 15 months prior thereto. During the taxable years 1956 and 1957 the petitioner kept no record of the illegal abortions which he performed or the amounts received therefor. He did keep in those years books in which daily entries were made in connection with his legitimate medical practice, showing names of patients and fees received. The total fees shown in such books for the taxable years 1956 and 1957 were, respectively, $30,067 and $26,042. Such books disclose that in 1956 the petitioner saw patients on about 348 days and that in 1957 he saw patients on about 214 of the 219 days prior to August 8. Recorded fees in the $11 to $19 range, inclusive, numbered about 330 for 1956 and about 215 for 1957 prior to August 8. During the 5-day period commencing Thursday August 1, 1957, the petitioner performed 8 abortions at an average price of $475, or a total of $3,800. Two *217 of such abortions were performed on August 1 for $1,000, two on August 2 for $1,000, one on August 3 for $400, two on August 4 for $1,000 and one on August 5 for $400. The petitioner's books show that in connection with his legitimate practice he also saw about 19 patients on August 1 and about 22 patients on August 5. During 1956 and 1957 the petitioners maintained in their names a joint checking account at the Bankers Trust Company. The balance in such account at January 1, 1956, was $6,018.88. During the year 1956 deposits were made thereto totaling $28,374.57, and charges against such account totaled $31,572.90, leaving a balance therein at January 1, 1957, of $2,820.55. During the year 1957 deposits were made totaling $24,723.28 and charges against such account totaled $23,802.32, leaving a balance therein at December 31, 1957, of $3,741.51. During 1956 and 1957 the petitioners maintained in their names a joint savings account in the East New York Savings Bank. Such account had a credit balance at the beginning of 1956 of $4,284.28. Deposits thereto in 1956 totaled $1,103.48 and withdrawals therefrom amounted to $5,355, leaving a balance at January 1, 1957, of $123.61. During *218 the year interest was credited in the amount of $90.85. During 1957 deposits to the account totaled $806.78. There were no withdrawals and the balance in the account at the end of 1957 was $944.86. During the year interest was credited to the account in the amount of $14.47. During 1956 and 1957 the petitioner Martha Chester maintained in her name a savings account at the Williamsburgh Savings Bank. Such account had a balance at the beginning of 1956 of $729.54. Deposits to the account during 1956 amounted to $970 and withdrawals totaled $1,000, leaving a balance of $709.55 at January 1, 1957. Interest was credited to the account during 1956 in the amount of $10.01. During 1957 there was one deposit to the account of $112.50 and there were no withdrawals, leaving a balance of $848.53 at December 31, 1957. Interest was credited to the account in 1957 in the amount of $26.48. The total deposited to the aforementioned accounts in 1956 and 1957, respectively, amounted to $30,448.05 and $25,642.56. The interest credited to the above accounts during 1956 and 1957 amounted to $100.86 and $40.95, respectively. At various times during 1956 and 1957 the petitioner opened or caused to be *219 opened 12 savings accounts under assumed names, in which he deposited his own funds. At all times the petitioner possessed complete ownership and control over the funds deposited in such accounts. The following tabulation shows the dates such accounts were opened and the amounts deposited therein for each year: Account
Date
Deposits
Name of Savings Bank
Number
Opened
1956
1957
Green Point
19979
1-24-56
$20,000
Green Point
19980
1-24-56
20,000
East New York
353765
4-11-56
20,000
East New York
353766
4-11-56
20,000
Manhattan
100905
1- 1-57
$ 20,000
Manhattan
100906
1- 1-57
20,000
Bowery
305093
2-15-57
20,000
Bowery
305095
2-15-57
18,900
Kings County
175591
3-11-57
20,000
Kings County
175592
3-11-57
20,000
Dime
1590604
6- 7-57
17,400
Dime
1590605
6- 7-57
18,300
Totals
$80,000
$154,600
Prior to April 1956 the petitioner made 6 deposits totaling $2,000. Thereafter, the monthly total of deposits was far greater. From April through November 20, 1956, deposits were made in the accounts in the East New York and Green Point savings banks several times each month, the total number of *220 days on which deposits were made being 44. By November 20, 1956, the amount in each of such accounts had reached $20,000 and thereafter no further deposits were made therein. The accounts in the Manhattan, Bowery, Kings County, and Dime savings banks were not opened until various times in 1957. The deposits in these accounts in 1957, except to the extent of $7,000, were made prior to August 8. The last deposit in 1957 was on October 28. From February 1, 1957 through October 28, 1957, deposits were made to the accounts in such banks several times each month, the total number of days on which deposits were made being 50. All deposits to the above 12 savings accounts were made by the petitioner in currency. There were no withdrawals from these accounts during 1956 and 1957. During 1956 and 1957 interest was credited to such accounts in the respective total amounts of $286.23 and $4,823.29. From November 9, 1940, until October 21, 1955, the petitioner maintained in his name a safe deposit box at Bankers Trust Company. From May 12, 1947 to April 25, 1958, he maintained in his name a safe deposit box at the East New York Savings Bank. The petitioner also maintained a safe deposit box *221 in an assumed name in the Diamond Center of America, which he relinquished on August 13, 1957. Throughout the years 1956 and 1957 each of the petitioners maintained a margin account with a stock broker, and they actively traded stocks on margin. At January 1, 1956, the petitioner Herman H. Chester had to his credit in his account 400 shares of Chrysler Corporation, 400 shares of U.S. Steel, and 1,000 shares of Sperry Rand, against which there was a debit due the broker of approximately $35,000. At January 1, 1956, the petitioner Martha Chester had to her credit in her account 160 shares of American Telephone & Telegraph and 200 shares of Chrysler Corporation, against which there was a debit due the broker of approximately $20,000. During 1956 the petitioner had an insurance policy covering personal property belonging to him and his wife. Among the assets listed were furs and jewelry valued by the petitioner at approximately $33,000. During each of the taxable years 1956 and 1957 the petitioner paid a maid $1,500 in cash. One-half of the maid's wages was for cleaning the petitioner's residence and one-half was for cleaning his business premises. The petitioners' joint income *222 tax return for the taxable year 1956 was prepared by Jacob Silvey, a certified public accountant who was married to a cousin of the petitioner. Therein the petitioner's gross income from his profession was reported to be $29,892.05. In arriving at this amount Silvey did not rely upon the petitioner's books. Rather, Silvey's computation was primarily based upon deposits which had been made to the petitioner's checking account at the Bankers Trust Company, his savings account at the East New York Savings Bank, and the savings account of the petitioner Martha Chester at the Williamsburgh Savings Bank. From the total deposits Silvey subtracted amounts totaling $7,606, some of which he determined did not constitute taxable income and some of which he determined to be income from sources other than the petitioner's profession. He then added an amount of $7,500 as cash expenditures made, which included $1,500 for a maid's salary. In the return the net profit from the petitioner's profession was computed to be $22,192.84 by deducting expenses of $7,699.21 which included one-half of the $1,500 paid to the maid. In such return the petitioners reported interest income from the savings accounts *223 in their names in the East New York and Williamsburgh savings banks in the total amount of $77.67. The return showed taxable income in the amount of $21,962.40. The petitioners' amended joint income tax return for the taxable year 1957 was apparently prepared by them. Therein the petitioner's gross income from his profession was reported to be $35,800. A net profit of $28,862.63 was computed from such profession by deducting expenses of $6,937.37. In such return the petitioners reported bank interest in the amount of $46.88. They also reported therein, under the heading of "Other Income", an amount of $3,500. The return showed taxable income of $30,373. In the notice of deficiency the respondent determined that the petitioners' correct taxable income for the taxable year 1956 was $104,949.09. This resulted from increasing income from the petitioner's profession by the amount of $80,000 (the amount of the deposits made to the savings accounts maintained under assumed names), by increasing interest income by $566.69, and by disallowing business expenses to the extent of $2,420. In such notice the respondent determined that the petitioners' correct taxable income for the taxable *224 year 1957 was $179,712.65. This resulted from increasing income from the petitioner's profession by the amount of $140,553.61 (which took into account the amounts deposited in all bank accounts, including the amount of $154,600 deposited in the savings accounts maintained under assumed names, and cash expenditures of $7,500 [2]), by increasing interest income by $5,523.48, by increasing dividend income by $112.50, by disallowing business expenses to the extent of $2,900, by disallowing contributions of $250, and by correcting a mathematical error of 6 cents. *225 In each of the years 1956 and 1957 the petitioner made cash expenditures of $5,000, which included $1,500 paid for maid services. On February 21, 1962, the petitioner was indicted by a United States grand jury for the Eastern District of New York for willful attempted evasion of the joint taxes due from him and his wife for the taxable years 1956 and 1957, in violation of section 7201 of the Internal Revenue Code of 1954, charging that he understated his net income in the returns for 1956 and 1957 by the respective amounts of $80,566.69 and $138,577.09. On October 31, 1963, the United States District Court found the petitioner guilty on both counts of the indictment. On January 29, 1964, the court sentenced petitioner to serve two concurrent terms in prison of 18 months each, 17 months of which was suspended. On January 29, 1964, the petitioner filed a notice of appeal from such sentence. On February 14, 1964, the court entered a stipulation for dismissal of the appeal. The petitioner Martha Chester was not a party to the criminal proceedings. Some part of the underpayment of tax for each of the taxable years 1956 and 1957 is due to fraud. Opinion *226 The deficiencies in tax result principally from the determination by the respondent that the amounts of $80,000 and $154,600 which, in the taxable years 1956 and 1957, respectively, the petitioner deposited in currency in the saving accounts maintained under assumed names constituted unreported income received by the petitioner from the practice of his profession as a physician. It is well settled that unexplained bank deposits are evidence of receipt of taxable income. Hoefle v. Commissioner, (C.A. 6) 114 F. 2d 713, affirming a Memorandum Opinion of this Court; Doll v. Glenn, (C.A. 6) 231 F. 2d 186; Goe v. Commissioner, (C.A. 3) 198 F. 2d 851, affirming a Memorandum Opinion of this Court; O'Dwyer v. Commissioner, (C.A. 4) 266 F. 2d 575, affirming 28 T.C. 698, certiorari denied 361 U.S. 862; and Fada Gobins, 18 T.C. 1159, affd. (C.A. 9) 217 F. 2d 952. The respondent's determination of a deficiency in tax carries with it a presumption of correctness, and the burden of proof is upon the taxpayer to show error therein. Welch v. Helvering, 290 U.S. 111, and Burnet v. Houston, 283 U.S. 223. *227 And this is true with respect to his determination that unidentified bank deposits constitute income. Hoefle v. Commissioner, supra; Doll v. Glenn, supra; and O'Dwyer v. Commissioner, supra. On brief the petitioner contends that almost all of the above amounts which were deposited in such accounts in 1956 and 1957 consisted of amounts earned in years prior to 1956. He testified that for the first two or three years of his practice of medicine, which commenced in 1922, he deposited a portion of his earnings in a safe; that thereafter he rented safe deposit boxes and placed therein a portion of his earnings for each subsequent year; that in 1951 the safe deposit boxes contained between $100,000 and $103,000, all of which had been reported as taxable income, except an amount of $8,800 which constituted an inheritance of his wife; that in 1951 he commenced performing illegal abortions; that in 1951 he performed about 60 abortions at an average fee of about $300; that in each of the years 1952 through 1955 he performed between 70 and 80 abortions at an average fee of nearly $400; that in each of the years 1951 through 1955 he reported as taxable *228 income about $7,000 or $8,000 of his illegal abortion income, and that the remainder each year was placed in his safe deposit boxes; that during 1956 he earned from $30,000 to $32,000 from performing abortions, of which about $22,000 to $25,000 was placed in the safe deposit boxes, the remainder of about $7,000 to $8,000 being reflected in his books showing receipts from his legitimate practice; that during 1957 prior to his arrest by the local authorities on August 8 he performed about 40 to 45 abortions at an average fee of about $475, or a total of from $19,000 to $22,375, of which about $14,000 to $17,375 was placed in the safe deposit boxes, the remainder of about $5,000 being reflected in his books showing receipts from his legitimate practice; [3] that altogether over the period 1923 through 1957 he placed about $235,000 in his safe deposits boxes; that he removed about one-third of such amount in 1956, and the remainder in 1957, and placed it in the savings accounts maintained under assumed names; and that he made visits to the safe deposit boxes for this purpose several times per month. *229 The petitioner did not keep records of the abortions he performed or the income received therefrom. The evidence with respect to the amounts he received from abortions in the years in question, and with respect to the source of the deposits to the savings accounts kept in assumed names, consists almost entirely of the petitioner's unsupported testimony. We cannot accept his uncorroborated, self-serving testimony as being sufficient to overcome the presumption in favor of the respondent's determination, particularly in view of the improbability of some of his assertions, the inconsistency between his testimony and his statements made at the time of his arrest for abortion, and the fact that the record establishes that he is not worthy of belief. He admitted that he omitted as much as $22,000 to $25,000 of abortion income from his 1956 return and that he lied when he signed such return. He also stated that he filed false returns for the years 1951 through 1955. While he testified before this Court that he commenced performing abortions in 1951 and continued to do so each year thereafter until his arrest in 1957, and that deposits made in 1956 and 1957 to the savings accounts maintained *230 in assumed names were made up largely of such abortion income, he stated unequivocally in a statement made to the assistant district attorney, Kings County, New York, at the time of his arrest that he commenced performing abortions about 14 or 15 months prior to his arrest. In such statement he stated: "I've told you the truth. I've told you everything. I've bared my soul, I've told you everything so help me God." Before us he stated that he lied in his statement to the assistant district attorney. Upon this record we are unable to make a finding as to when the petitioner commenced performing abortions. Hence we cannot accept his statement that in years prior to 1956 he received and deposited in the safe deposit boxes the amounts of abortion income claimed. If he did have such income in prior years we are not in a position to determine the amount thereof. Nor can we find, as claimed by the petitioner, that in 1951 his safe deposit boxes contained between $100,000 and $103,000 which, except for an $8,800 inheritance of his wife, consisted of earnings accumulated from his legitimate practice which had been reported as income. It seems improbable that the petitioner would hoard such *231 an amount in this manner instead of investing it and receiving a return thereon. He did testify in effect that during the 1920's he placed cash in a safe because of his distrust of banks due to the experience of some of his relatives who lost money because of bank failure, but he did not testify that this was his reason for continuing to deposit his legitimate income in safe deposit boxes throughout the years prior to 1951 and allowing the claimed accumulation to remain in the boxes thereafter. Moreover, even if he did have some cash in his safe deposit boxes we cannot find that such was the source of the deposits to the savings accounts in 1956 and 1957. The evidence shows that deposits were made in the savings accounts several times each month and the deposits were made on 50 days in 1956 and on 50 days in 1957 up to October 28. The petitioner did not furnish proof as to the dates on which he entered his safe deposit boxes. He stated that the banks could not give him a record of such entries, but he did not state why. We think it improbable that the petitioner withdrew funds from his safe deposit boxes in this piecemeal fashion for deposit in the savings accounts, and he offered *232 no explanation of why he would do so. Indeed, some of the evidence tends to support the respondent's contention that the deposits in the savings accounts consisted entirely of currently earned abortion income. It was not until April 1956 that any substantial deposits were made in such accounts, and that was approximately the time the petitioner told the assistant district attorney that he commenced performing abortions. Furthermore, there were only 3 deposits, totaling $7,000, made to the accounts in 1957 after August 8, the date on which the petitioner was arrested and ceased performing abortions. In this connection we note that the petitioner testified that he had in his home at the time of his arrest several thousand dollars in cash which he used or deposited. The petitioner further contends that it was not possible for him to have performed the number of abortions in the 7-month period of 1957 prior to his arrest which would have been necessary to result in the receipt of approximately $154,000 at $475 per operation. In this connection he testified that due to the fact that he suffered from physical ailments and that he under-went emotional stress and severe strain in performing *233 abortions, he performed such operations during only one out of every 3 or 4 weeks. We do not doubt that the petitioner did suffer physical ailments, but we think that he has failed to show that he was physically unable to have performed enough operations to yield the income in question. And it should be observed that the petitioner presented no evidence as to the time required by him to perform an abortion. However, the evidence shows, and the petitioner admits, that in the five-day period beginning August 1, 1957, he performed 8 abortions. Two of such abortions were performed on August 1 and one was performed on August 5. The petitioner's books indicate that on those dates he saw about 19 and 22 patients, respectively, in his legitimate practice. On the record before us we cannot conclude that it was impossible for the petitioner to have earned the amounts in question from performing abortions in 1956 and 1957. We hold that the petitioner has failed to show error in the respondent's determination that the amounts of $80,000 and $154,600 deposited in 1956 and 1957, respectively, in the savings accounts maintained in assumed names constituted income received by the petitioner from *234 the practice of his profession. In computing the amount of petitioner's unreported professional income, the respondent included for each of the taxable years in question an amount of $7,500 as representing cash expenditures. The petitioner apparently does not question the correctness of the respondent's determination that cash expenditures should be so included, but questions the amount thereof. He testified that he paid the maid $1,500 in cash in each of such years, and that he spent in cash about $40 per week (about $2,000 per year) for food. He also testified that he spent cash for laundry and travel by plane and train. He further stated that he spent small amounts of cash for tobacco and restaurant meals. He testified that the rest of his expenses were paid by check. The figure of $7,500 is the figure which the petitioner's accountant estimated as cash expenditures in computing the petitioner's professional income for the taxable year 1956. The petitioner, while admitting that he signed the return for that year, testified that he did not discuss the item of living expenses with his accountant and that he did not know that the accountant was including an amount of $6,000 as his *235 living expenses. On brief it is contended that the amount which should be included as cash expenditures should be $3,500, consisting of the maid's salary of $1,500, plus $2,000 for food. From the petitioner's testimony it appears that his cash expenditures were in excess of $3,500. On the other hand, the respondent's determination of $7,500 appears to have resulted from the acceptance of the accountant's figure used for 1956. Under the circumstances, we think the proper amount lies between the two figures. Such amount is not susceptible of a precise determination, but we feel it incumbent upon us to exercise our best judgment and make the best estimate possible upon the evidence before us. This we have done, and have found that in each of the taxable years in question the petitioner made cash expenditures of $5,000, which includes in each year $1,500 paid to the maid. For each year the amount of $5,000 will be included in the computation of the petitioner's income from his profession. In the petition an issue is raised as to the respondent's disallowance of a portion of the business expense deductions claimed for each year. However, no evidence was presented and no mention was made *236 by the petitioners on brief with respect thereto, except as to one-half of the maid's salary of $1,500 for each year. In his return for 1956 the petitioner included among deductions $750 of the maid's salary, and there is no showing that a similar amount was not included among the deductions claimed in his return for 1957. The respondent allowed the bulk of the deductions claimed by the petitioner for each year, and there has been no showing that the portion disallowed for either year included the amount claimed on account of the maid's salary. Under the circumstances, we approve the respondent's disallowance of the amounts of $2,420 and $2,900 of the deductions claimed for the taxable years 1956 and 1957, respectively. In their return for the taxable year 1956 the petitioners reported interest income of $77.67. This was from the savings accounts which they maintained in their own names. The evidence shows, and we have found, that in 1956 interest was credited to such accounts in the total amount of $100.86. In addition, in 1956 interest was credited to the savings accounts maintained in assumed names in the total amount of $286.23. Accordingly, the petitioners failed to report in *237 their return for 1956 interest income of $309.42. In their return for the taxable year 1957 the petitioners reported bank interest of $46.88. This was from the savings accounts which they maintained in their own names. The evidence shows, and we have found, that in 1957 interest was credited to such accounts in the total amount of $40.95. In 1957 interest was credited to the savings accounts maintained in assumed names in the total amount of $4,823.29. Accordingly, the amount of interest on which the petitioners are taxable for 1957 is $4,817.36 in excess of the amount which they reported as interest income in their return. In their return for 1957 the petitioners reported an amount of $3,500 under the heading "Other Income." The petitioner testified that he believed this represented interest from savings accounts maintained in assumed names. The respondent, in making his computation of the petitioners' taxable income, gave the petitioners credit for the full amount of income reported, including the $3,500. Consequently, whether such item of $3,500 constituted interest income or income from some other source does not establish error in the respondent's determination of the amount *238 of taxable income. There remains the question of whether the petitioners are liable for additions to tax under section 6653(b) of the Code. [4] This depends upon whether any part of the underpayments in tax for the taxable years 1956 and 1957 is due to fraud. The burden of proof with respect to fraud is upon the respondent. Section 7454(a) of the Code. *239 Fraud is never presumed but must be shown by clear and convincing proof. Frank Imburgia, 22 T.C. 1002; United States v. Lease, (C.A. 2) 346 F. 2d 696; and Drieborg v. Commissioner, (C.A. 6) 225 F. 2d 216. The evidence shows that the petitioner was convicted by the United States District Court for the Eastern District of New York of willfully attempting to evade his income taxes for the taxable years 1956 and 1957, in violation of section 7201 of the Internal Revenue Code of 1954. Accordingly, he is collaterally estopped from denying that a part of the underpayments for those years was due to fraud with intent to evade tax, within the meaning of section 6653(b) of the Code. John W. Amos, 43 T.C. 50, affd. (C.A. 4) 360 F. 2d 358; Arctic Ice Cream Co., 43 T.C. 68; Tomlinson v. Lefkowitz, (C.A. 5) 334 F. 2d 262, certiorari denied 379 U.S. 962; and Moore v. United States, (C.A. 4) 360 F. 2d 353, certiorari denied 385 U.S. 1001. The petitioners contend that the doctrine of collateral estoppel does not apply in view of the holdings *240 in Moore v. United States, supra, that the criminal conviction of a husband did not collaterally estop his wife in a civil proceeding from litigating the question of her husband's fraud in the preparation of their joint tax return, for the purpose of determining whether she is jointly and severally liable, under section 6013(d)(3) of the Code, for additions to the tax on account of her husband's fraud. It is their position that collateral estoppel cannot practicably be invoked against either of them, since applying the rule of estoppel against Herman Chester alone would create a liability against Martha Chester in an instance in which she was not accorded her day in court. Suffice it to say that in Moore v. United States, supra, the court did apply the doctrine of collateral estoppel in determining the husband's liability for the additions to tax for fraud, despite its holding that the husband's criminal conviction did not preclude the wife from contesting the question of her husband's fraud in the civil proceedings. Clearly the doctrine of collateral estoppel applies to the petitioner Herman Chester. The respondent did not plead, and does not contend, that *241 the petitioner Martha Chester is collaterally estopped to deny fraud on the part of her husband, and therefore it is not necessary for us to consider whether, had the issue been raised, the doctrine of estoppel would apply as to her. However, it is our conclusion that fraud has been shown on the part of petitioner Herman Chester for each year by clear and convincing evidence, without regard to his prior conviction. The evidence establishes that in both 1956 and 1957 the petitioner, in addition to his legitimate practice of medicine, engaged in the performance of illegal abortions. He kept no record of the number of abortions performed or the income derived therefrom. In both years he maintained savings accounts under assumed names, and deposited therein large amounts of cash. As pointed out hereinabove, we are not satisfied with his explanation that, in the main, the deposits to these accounts represented savings accumulated in prior years. At the hearing the petitioner, in effect, admitted that a portion of the underpayment of tax for the taxable year 1956 was due to fraud. [5] He testified, however, that when he filed his tax return for the taxable year 1957, he tried to be as careful *242 as he could to report all of his income, including the income from the performance of abortions, since he had already been arrested for abortion and knew that "things would be scrutinized more than before." He conceded that "I must have made some mistake there, because subsequently I realized that I had had a few more abortions than I thought at the beginning." The petitioner testified that in 1957 he received as much as $19,000 to $22,375 from the performance of abortions. He conceded that he reported in his return no more than $14,800 thereof. This would amount to the omission of from 22 to 30 percent of the illegal income which he concedes that he had. We fail to see how such omission could have been a "mistake." The return for 1957 was not filed until 1959. It would seem that in 1959 he would have been in a better position than at the time of the hearing to know the number of abortions performed in 1957 and the prices charged therefor. In addition, we think the evidence affirmatively establishes that much more of such abortion income was omitted from his return than he concedes. As pointed out hereinabove his testimony that he "built up" the income shown on his books from his legitimate *243 practice to reflect about $5,000 of his abortion income (and that to that extent the abortion income was included in his return) is not borne out by an analysis of such books. On the contrary, no more than about $2,150 could possibly have been reflected in such manner. In addition, even if it is true, as stated by the petitioner, that the item of $3,500 included in his 1957 return as "Other Income" represented interest credited to his savings accounts maintained in assumed names, there would still remain unreported an amount of approximately $1,300 of such interest income, which we believe that the petitioner must have known had been earned. *244 Accordingly, wholly aside from the doctrine of collateral estoppel, and without relying to any extent upon the presumption in favor of the respondent's determination of the deficiency in tax, it is our conclusion that the evidence clearly and convincingly establishes that a substantial part of the underpayment in tax for 1957 is due to fraud. Accordingly, the petitioner Martha Chester is jointly and severally liable for the deficiencies, and additions thereto, even though she was not a party to the fraud. W. L. Kann, 18 T.C. 1032, affd. (C.A. 3) 210 F. 2d 247; Ginsberg Estate v. Commissioner, (C.A. 5) 271 F. 2d 511; and Myrna S. Howell, 10 T.C. 859, affd. (C.A. 6) 175 F. 2d 240. On brief the petitioners also contend that since the notice of deficiency was issued more than three years after the filing of the 1957 income tax return, the statute of limitations is an effective bar to the assessment and collection of the deficiency for the taxable year 1957. The issue of the statute of limitations was not raised in the pleadings and hence is not properly before us. United Business Corporation of America, 19 B.T.A. 809, *245 and Robert G. Robinson, 12 T.C. 246. But, even if it were in issue, the decision would have to be against the petitioners, since we think the evidence clearly shows that the return for 1957 was false or fraudulent with the intent to evade tax within the meaning of section 6501(c) of the Code, which provides that in such case the tax may be assessed at any time. Decision will be entered under Rule 50. Footnotes
1. Prior to the filing of such return the petitioners were granted extensions of time to file their 1957 return until October 15, 1958.↩
2. On brief the respondent sets forth the computation of the $140,553.61 item as follows: ↩
Total deposits to all bank accounts
$180,130.06
Payments made in cash (same as
item of $7,500.00 included in pe-
titioners' return for 1956)
7,500.00
Subtotal
$187,630.06
Less: Non-income deposits
7,776.45
Gross receipts
$179,853.61
Less: Reported business costs and
expenses
6,937.37
Net Income from Profession
$172,916.24
Less: Reported net income from
Profession (including $3,500 un-
identified "Other Income" re-
ported on return for 1957)
32,362.63
Unreported Income from Pro-
fession
$140,553.61
3. The petitioner testified that he "built up" the income from his legitimate practice shown in his books by placing the digit "1" before some of the fees of less than $10 which had been recorded in such books. He stated that, for example, a recorded fee of $3 or $5 would be changed to $13 or $15. Our examination of the books discloses that in 1956 the total number of items shown at between $11 and $19, inclusive, was approximately 330, and that for 1957, up to August 8, the total number of such items was approximately 215. Thus, even if all such items represented fees altered in such manner, the maximum amount of abortion income that would have been reflected in the books would be about $3,300 for 1956 and about $2,150 for the period January 1 to August 8, 1957. It is clear, therefore, that the petitioner could not have included in his books in this manner abortion income of about $7,000 to $8,000 for 1956 and about $5,000 for 1957 as claimed.↩
4. Section 6653 of the Code provides in part: (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * (c) Definition of Underpayment. - For purposes of this section, the term "underpayment" means - (1) Income, estate, and gift taxes. - In the case of a tax to which section 6211 (relating to income, estate, and gift taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *.↩
5. The petitioner testified in part as follows: Q In 1956 were you not aware that receipts, cash you received from performing illegal operations, are income under the federal income tax laws? A That's right. Q And you did not, in 1956, report all of your income from that source, the illegal operations. A I did not. * * *
Q And your 1956 return was not correct, is that correct? You did not report all of the income you received in that year, isn't that true? A That is true. Q In other words, you lied when you signed this return. A I did.↩