T.C. Memo. 1995-529

UNITED STATES TAX COURT

JOSEPH T. WALKER AND NANCY WALKER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WEST JERSEY MANUFACTURING CO., INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[1]

Docket Nos.    4923-90, 18842-90,    Filed November 8, 1995.
               28294-91.

Joseph T. Walker, pro se, in docket No. 4923-90.

Mark E. Cedrone, for petitioner Nancy Walker, in docket No.
4923-90.

Joseph T. Walker (an officer), for petitioner West Jersey

Manufacturing Co., in docket Nos. 18842-90, 28294-91.

Richard E. Buchbinder and Craig Connell, for respondent.

---

[1]This Court granted petitioners' motion to consolidate on
Dec. 4, 1992.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows:

Joseph T. and Nancy Walker
Docket No. 4923-90

| Year | Deficiency | Additions to Tax Sec. 6653(b)[1] |
|------|------------|------------------------------------|
| 1978 | $96,900.21 | $48,450.11 |
| 1979 | 104,619.49 | 52,309.75 |
| 1980 | 183,321.39 | 91,666.07 |
| 1981 | 124,031.84 | 62,015.92 |

[1] The fraud addition was determined as to Joseph T. Walker only.

West Jersey Manufacturing Co., Inc.
Docket Nos. 18842-90 and 28294-91

| Year | Sec. Deficiency | Additions to Tax Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6653(b) | Sec. 6661 |
|------|-----------------|-----------------------------------|-----------------|--------------|-----------|
| 3/31/78 | $963.00 | -- | -- | $481.50 | - |
| 3/31/79 | 123,397.51 | -- | -- | 60,998.96 | - |
| 3/31/80 | 81,435.75 | -- | -- | 40,717.87 | - |
| 3/31/81 | 174,068.45 | -- | -- | 85,263.85 | - |
| 3/31/82 | 101,585.07 | -- | -- | 101,585.07 | - |
| 3/31/83 | 0.00 | $7,286.48 [1] | | -- | $36,432.38 |
| 3/31/85 | 88,180.05 | 4,409.00 [2] | | -- | 22,045.01 |

[1] 50 percent of the interest due on $145,729.51.
[2] 50 percent of the interest due on the deficiency.

After concessions, the remaining issues we must decide are: (1) Whether respondent's determination with respect to unreported taxable income of petitioner Joseph T. Walker (Mr. Walker), for 1978, 1979, 1980, and 1981, should be reduced to take into account certain alleged additional cash payments Mr. Walker made to two individuals

that were involved in overbilling and kickback arrangements with Mr. Walker and petitioner West Jersey Manufacturing Co., Inc.(West Jersey); (2) whether Mr. Walker and petitioner Nancy Walker (Mrs. Walker) filed joint individual income tax returns for 1978, 1979, 1980, and 1981; and (3) whether Mrs. Walker is entitled to relief for any tax liabilities determined with respect to her for 1978, 1979, 1980, and 1981, as an innocent spouse under section 6013(e).[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated by this reference.

At the time their petition was filed, Mr. Walker and Mrs. Walker resided in Stone Harbor, New Jersey. They were married in June 1963. From June 1963 through the time of the trial in the instant cases, Mr. Walker and Mrs. Walker have been married to one another and have resided together. Mr. Walker filed with the Internal Revenue Service (IRS), for each of the years 1978, 1979, 1980, and 1981, a Form 1040, Individual Income Tax Return, which was stated to be the joint individual income tax return of himself and Mrs. Walker. Although Mr. Walker signed his own name to each of the returns, he did not have Mrs. Walker execute the returns. Mr. Walker or another individual, acting at Mr. Walker's direction, subscribed Mrs. Walker's

---

[2]All section references are to the Internal Revenue Code as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

purported signature to each of the returns.

Prior to the time its petitions were filed, West Jersey, a New Jersey corporation, maintained its office and principal place of business in New Jersey. West Jersey was incorporated in about 1970 by Mr. Walker, William Reilly (Reilly), and a third individual. Mr. Walker and Reilly became the only shareholders of West Jersey sometime well prior to 1978.

From 1978 through about 1984, Mr. Walker was the president and a 50-percent shareholder of West Jersey. Reilly owned the other 50 percent of West Jersey's outstanding shares of stock and also served as an officer of West Jersey.

West Jersey engaged in the business of manufacturing and selling steel pipe flanges. Substantially all of its sales were made to various contractors working on nuclear power plant construction projects throughout the country. West Jersey had been certified to manufacture pipe flanges used in nuclear power plants and was one of the few manufacturers of pipe flanges in the country which had such a nuclear certificate.

Overbilling and Kickback Arrangements

During 1978 through 1981, West Jersey participated in overbilling and kickback arrangements with two contractor purchasing agents, Robert Short (Short) and William Simmel (Simmel), with respect to certain purchases Short's and Simmel's respective employers made from West Jersey. Short was employed as a purchasing manager with B.F.

Shaw, Inc. (B.F. Shaw). Simmel was employed as a purchasing manager with Pullman, Inc. (Pullman).

The overbilling and kickback arrangement with Short covered only certain specially fabricated items that Short ordered on behalf of B.F. Shaw from West Jersey. The kickback arrangement did not apply with respect to stock fabricated items that West Jersey sold B.F. Shaw, because the prices West Jersey charged B.F. Shaw with respect to the stock items generally were fixed under a previously established price list for such stock items.

Typically, overbilling would occur after Short or Simmel, as purchasing agent for his employer, contacted Mr. Walker or another West Jersey employee, requested a price quote on certain items, and then placed an order for the items. With Short's or Simmel's knowledge and connivance, the price West Jersey later billed and charged B.F. Shaw or Pullman for the ordered items would 'be inflated above the price originally quoted to Short or Simmel. Mr. Walker would record the amounts West Jersey overbilled B.F. Shaw and Pullman (i.e., the difference between the inflated price West Jersey charged and the originally quoted price) in various notebooks he maintained for each company. Pursuant to the overbilling and kickback arrangement with Short, part of the overbilled amounts that West Jersey collected from B.F. Shaw was required to be paid over to Short. Essentially, Short was to receive a 50-percent share of the overbilled amounts that West Jersey collected from B.F. Shaw. Similarly, under the overbilling and kickback arrangement with Simmel, part of the overbilled amounts that

West Jersey collected from Pullman was required to be paid over to Simmel.

During 1978 through 1981, some of West Jersey's funds were diverted from West Jersey by Mr. Walker and Reilly, West Jersey's two shareholders. They diverted and obtained these funds by having West Jersey's bookkeeper write checks on West Jersey's corporate checking account payable to various employees and vendors of West Jersey, endorse the checks with the payee's name, cash the checks, and give over the funds obtained to Mr. Walker or Reilly. These fictitious payments to employees and vendors were then deducted on West Jersey's income tax returns as part of its promotional expenses, freight, and other miscellaneous expenses.

During West Jersey's fiscal years ended March 31, 1979 through March 31, 1982, Reilly diverted and received funds from West Jersey as follows:

| FYE | Amount |
| --- | --- |
| 3/31/79 | $61,828.38 |
| 3/31/80 | 65,986.10 |
| 3/31/81 | 69,945.58 |
| 3/31/82 | 28,184.91 |

During 1978 through 1981, Mr. Walker diverted and received funds from West Jersey as follows:

| Year | Amount |
| --- | --- |
| 1978 | $150,997.52 |
| 1979 | 165,408.05 |
| 1980 | 277,621.19 |
| 1981 | 195,516.87 |

However, some of these diverted funds Mr. Walker obtained were then paid over by him to Short and Simmel pursuant to the respective overbilling and kickback arrangements with Short and Simmel.

During 1978, 1979, 1980, and 1981, Mr. Walker each year used, respectively, $58,150, $50,705.16, $59,175, and $11,000.00, of the funds he had diverted to purchase cashier checks payable to and given to Simmel. Similarly, during 1980, Mr. Walker used $44,141.87 of the diverted funds to purchase a boat for Short.

Additionally, during 1980 and 1981, Short received a total between $2,000 and $3,000 in cash from Mr. Walker. Mr. Walker further paid for certain outings and trips of Short's, and also purchased jewelry for Short. The cash, jewelry, outings, trips, and the boat were treated by Mr. Walker and Short as payments to Short of amounts due him under their overbilling and kickback arrangement.

On its income tax returns for fiscal years ended March 31, 1979, through March 31, 1982, West Jersey reported gross sales as follows:

| Fiscal Year Ended | Gross Sales |
| --- | --- |
| 3/31/78 | $2,745,276.60 |
| 3/31/79 | 3,632,049.69 |
| 3/31/80 | 3,584,660.75 |
| 3/31/81 | 4,373,085.98 |
| 3/31/82 | 3,780,177.24 |

During 1978 through 1981, West Jersey's respective annual gross sales to B.F. Shaw (Short's company) and Pullman (Simmel's company) were as follows:

| Year | Gross Sales To B.F. Shaw | Gross Sales To Pullman |
|------|------|------|
| 1978 | -- | $455,939.02 |
| 1979 | -- | 753,429.99 |
| 1980 | $445,040.51 | 937,052:08 |
| 1981 | 410,675.97 | 513,501.72 |

In 1984, a grand jury investigation was commenced with respect to Mr. Walker's and West Jersey's activities during 1978 through 1981, in connection with their overbilling and kickback arrangements with Short and Simmel.

On April 1, 1985, the U.S. Attorney for the District of New Jersey filed an information with the U.S. District Court for the District of New Jersey, charging Mr. Walker with eight counts of criminal tax violations and mail fraud, stemming from Mr. Walker's actions, during 1978 through 1981, with respect to the overbilling and kickback arrangements. On May 21, 1985, Mr. Walker pleaded guilty to five of the eight counts of the information. On May 23, 1985, the U.S. District Court entered its judgment of conviction against Mr. Walker on the five counts, fined Mr. Walker $15,000, and sentenced him to be placed on probation for a 5-year period.

Mrs. Walker

Mrs. Walker completed high school in 1959 and then attended a 1-year program at a vocational school to become a medical technical

secretary. While attending the vocational school, during 1961, she held a part-time job as a secretary to the administrator of a hospital located in Philadelphia, Pennsylvania.

Following her graduation from the vocational school, she obtained full-time employment as a secretary and physical therapist at another Philadelphia hospital. She worked at the hospital for approximately 2 years until about October 1963.

Mrs. Walker left her full-time job with the hospital in October 1963, due to medical difficulties she experienced during her pregnancy with the Walkers' first child. The first-child was born on May 18, 1964. From 1964 through 1984, Mrs. Walker devoted herself to taking care of her home and five children.

While in high school, Mrs. Walker had taken courses in bookkeeping and accounting. She later helped keep the books and records of a skating club some of her children belonged to. Much later, after she had resumed working in 1985, Mrs. Walker kept West Jersey's books for a relatively short period of time.

During 1978 through 1981, Mrs. Walker was involved to some degree in keeping her and Mr. Walker's family records. She took care of her and Mr. Walker's joint checking account by organizing canceled checks by month in numerical order, and placing the canceled checks in an accordion folder with the related monthly statement for the account. Mrs. Walker wrote checks on the account to pay for most of their household expenses. However, Mr. Walker and West Jersey's bookkeeper made the deposits to the account.

During 1978 through 1981, the only checking account that either Mr. Walker or Mrs. Walker maintained was their joint checking account. During 1978 through 1981, the total amount of checks they wrote, and total amount of deposits they made, with respect to the account for each year were as follows:

| Year | Total Checks Written | Total Deposits Made |
|------|----------------------|---------------------|
| 1978 | $209,693.94 | $247,604.68 |
| 1979 | 259,427.54 | 240,911.51 |
| 1980 | 333,693.04 | 386,649.63 |
| 1981 | 224,928.48 | 214,627.62 |

On November 18, 1980, Mr. Walker paid $76,504.95 to Merrill Lynch by writing a check on his and Mrs. Walker's joint checking account. On April 16, 1981, Mr. Walker paid $15,680 to a Cadillac dealership by writing a check on the account.

During 1978 through 1981, the sources for the funds Mr. Walker deposited each year into the joint checking account were as follows:

| | 1978 | 1979 | 1980 | 1981 |
|---|------|------|------|------|
| Mr. Walker's West Jersey Salary Net of Withholding | $89,335.34 | $89,l002.39 | $99,676.26 | $98,726.12 |
| Tax Refund | -- | 10,185.67 | 11,709.73 | 8,733.15 |
| West Jersey Loan Repayment Checks | 46,043.40 | 71,000.00 | 24,283.60 | -- |
| West Jersey "Reimbursement" Checks | 66,091.19 | 12,803.51 | 135,000.00 | 61,889.60 |
| West Jersey Check for Unspecified Purpose | -- | -- | 7,500.00 | -- |
| Unknown Sources | 46,134.75 | 57,919.94 | 108,480.04 | 45,278.75 |

Mr. and Mrs. Walker's Lifestyle

From the early 1970's through 1981, Mr. and Mrs. Walker and their family lived very well. Following West Jersey's incorporation in 1970, Mr. Walker began to earn substantially more income than he had earned in prior years.

During the early 1970's, Mr. Walker received an annual salary of $200,000 from West Jersey. Prior to 1970, Mr. Walker had been employed as a salesman at two steel companies. From 1963 through about 1968, Mr. Walker worked at Bethlehem Steel. After 1968, he then worked for about a year and a half as a salesman at Philadelphia Steel & Iron.

However, beginning in about 1974, Mr. Walker's annual salary from West Jersey was reduced significantly, from $200,000 to $130,000, as the result of an IRS examination that concluded that the prior annual salary of $200,000 was not reasonable compensation. With respect to the $200,000 annual salary received during one or more of the years prior to 1974, the IRS required Mr. Walker to treat salary in excess of $130,000 as constructive dividend income. During 1978 through 1981, Mr. Walker received annual compensation from West Jersey as follows:

| Year | Compensation |
|------|--------------|
| 1978 | $130,000.00 |
| 1979 | 130,000.00 |
| 1980 | 145,937.50 |
| 1981 | 144,950.00 |

In 1969, Mr. and Mrs. Walker purchased for $72,000 a fivebedroom home located in an affluent neighborhood in Cherry Hill,

New Jersey. The home has a swimming pool. Mr. and Mrs. Walker own the home jointly. They paid the $72,000 purchase price for the Cherry Hill home using proceeds from the sale of the prior home which they owned and through obtaining a $40,000 20-year mortgage loan.

Mr. and Mrs. Walker used the Cherry Hill home as their principal residence from 1969 through about 1989, and have continued to own it through the time of the trial. In 1980, Mr. and Mrs. Walker paid about $50,000 to renovate and remodel the kitchen of their Cherry Hill home.

In 1974, Mr. and Mrs. Walker jointly acquired a vacation home at the Jersey shore in Stone Harbor, New Jersey, which abuts the shoreline of a bay. The home was built for them during 1973 and 1974. They did not obtain a mortgage loan to acquire the Stone Harbor property, but paid the full $125,000 purchase price for the property in installments over the course of the home's construction. Until about 1989, the home was used exclusively by them and their family as a vacation home, and was not rented out to others. From 1990 through the time of trial, the Stone Harbor home has been used as Mr. and Mrs. Walker's principal residence.

During 1978 through 1981, both the Cherry Hill and Stone Harbor homes were nicely furnished. Mr. and Mrs. Walker purchased some furnishings for the homes during 1978 through 1981, including furnishings purchased when the kitchen of their Cherry Hill home was remodeled in 1980.

During 1978 through 1981, Mr. and Mrs. Walker employed a housekeeper at their Cherry Hill home.

At various times during 1978 through 1981,, Mr. and Mrs. Walker drove a 1979 BMW, a 1981 BMW, a Cadillac, a 1976 Mercedes, and a Subaru. These cars were held in Mrs. Walker's name. They acquired the 1979 BMW by paying some cash and trading in the 1976 Mercedes. They later acquired the 1981 BMW by paying some cash and trading in the 1979 BMW. Subsequent to 1981, the 1981 BMW was traded in to acquire a 1990 Honda Accord held in Mrs. Walker's name that cost $15,200.

During 1978 through 1981, Mr. and Mrs. Walker each owned at least $20,000 in jewelry. A substantial portion of this jewelry was acquired during 1978 through 1981. Among the items of jewelry that Mr. Walker purchased and gave to Mrs. Walker, during 1978 through 1981, was a diamond tennis bracelet and a Rolex watch.

During 1978 through 1981, Mr. and Mrs. Walker spent between $16,000 to $20,000 a year for skating lessons for some of their children and in attending the children's skating competitions along the East Coast, including competitions in Atlanta, Georgia; Lake Placid, New York; and Virginia. During 1978 through 1981, they and their children took family vacations in Aspen, Colorado; Lake Placid, New York; and Florida. Mr. Walker also took vacations in the Bahamas once or twice a year. His wife and family may have accompanied him on some of his trips to the Bahamas during 1978 through 1981.

From 1977 through about 1985, unbeknownst to Mrs. Walker, Mr.

Walker carried on an affair with another woman. During 1978 through 1981, he helped support this woman by giving her about $15,000 a year in cash and other gifts. In addition, he purchased a $10,000 BMW for her in 1978.

During 1978 through 1981, Mr. Walker and Reilly (West Jersey's other shareholder) jointly owned several other corporations besides West Jersey. One of their corporations owned and operated a 53-foot Hatteras yacht and a 46-foot Hatteras sport fishing boat. Another corporation owned and operated an airplane. In addition, during 1978 through 1981, West Jersey owned a Rolls Royce, and it or one of Mr. Walker's and Reilly's other jointly owned corporations owned a condominium.

In about 1984, Reilly withdrew from the operation of West Jersey. He then sued Mr. Walker to obtain payment for his interest in the assets of all the corporations he and Mr. Walker jointly owned. As a result, the airplane, boats, car, and condominium owned by West Jersey and their other corporations were sold, and the proceeds divided between Reilly and Mr. Walker.

After Reilly's withdrawal from West Jersey's operation in 1984, Mr. Walker continued to operate West Jersey and conduct its pipe flange manufacturing business. Shortly before or after Reilly's withdrawal, Mr. Walker loaned $300,000 to West Jersey. Mrs. Walker resumed working and performed clerical tasks at West

Jersey's office in 1985. Later, after West Jersey's bookkeeper left, Mrs. Walker kept West's Jersey's books for a short time.

However, Mr. Walker's efforts to continue conducting West Jersey's pipe flange manufacturing business were not successful, because of adverse publicity about West Jersey's and Mr. Walker's prior involvement in the overbilling and kickback arrangements. West Jersey experienced a drastic decline in its sales and suffered financial losses. After he concluded that West Jersey's business could not be operated profitably, Mr. Walker liquidated its assets and business in 1985.

In about 1986, at least $40,000 that Mr. Walker obtained from the liquidation of West Jersey's assets and business was used to capitalize and establish another corporation, Piping Supplies, Inc. (PSI). PSI's shares of stock were issued to Mrs. Walker and a son of theirs who is an engineer or a machinist.

PSI is engaged in a pipe flange manufacturing business similar to the business that West Jersey previously conducted. As of the time of trial, PSI had gross annual sales of between $1.3 million to $1.4 million.

Mrs. Walker has served as PSI's president. Although Mr. Walker, at various times from 1986 through the time of trial, has worked on a daily basis at PSI, he has not drawn a salary from PSI. He and Mrs. Walker have lived on the salary Mrs. Walker received from PSI.

Various Individual Tax Returns, Petition Filed By Mr. And Mrs.
Walker, And Their Pretrial Activities

Prior to her marriage to Mr. Walker, Mrs. Walker prepared and filed her own income tax returns. She knew of her obligation to file tax returns.

After Mr. Walker and Mrs. Walker were married in June 1963, Mr. Walker, in 1964, prepared and filed a 1963 joint individual income tax return for them, which included the income Mrs. Walker received during 1963 from her prior job at the Philadelphia hospital. From 1964 through at least about 1989, Mr. Walker continued to file yearly joint individual income tax returns for himself and Mrs. Walker.

Mrs. Walker was aware that Mr. Walker was filing these joint returns for them. $he left the responsibility of filing their tax returns to him. Mrs. Walker never sought to file a separate income tax return for herself during their marriage, nor did she ever object to Mr. Walker's filing a joint individual income tax return for them. Throughout the course of their marriage, Mrs. Walker knew that Mr. Walker retained the services of various accountants to help prepare and file their joint income tax returns. During 1975 through 1989, she and Mr. Walker occasionally met with one or more of their accountants socially.

Robert W. Gargone (Gargone) served as Mr. Walker's and Mrs. Walker's personal accountant from about 1975 through 1989, and prepared yearly joint individual income tax returns for them during this time.  During the late 1970's and early 1980's, Gargone

represented them during one or more examinations conducted by the IRS of their previously filed income tax returns. During the course of Gargone's service as their accountant, return preparer, or authorized representative, neither Mr. Walker or Mrs. Walker ever told Gargone that Mrs. Walker did not intend to file a joint tax return for any year.

The returns Mr. and Mrs Walker filed for each of the years from 1963 through 1977 were valid joint individual income tax returns of Mr. and Mrs. Walker.

Mr. and Mrs. Walker received tax refunds for 1978, 1979, 1980, and 1981, as a result of the respective joint returns they filed for those years.

During the course of examinations the IRS conducted of their 1978,' 1979, 1980, and 1981 returns, Mrs. Walker never expressed any indication of not having acquiesced to Mr. Walker's filing of the returns as joint returns. During the period from about late December 1985 through 1988, she received in the mail various letters from the IRS regarding their 1979, 1980, and 1981 tax liabilities, and was aware that this correspondence was addressed both to her and Mr. Walker. Each of the letters from the IRS enclosed a Form 872, Consent to Extend the Time to Assess Tax. She discussed these letters with Mr. Walker, and was told by him that they had to sign the enclosed Forms 872, which she did.

A timely petition was filed on behalf of Mr. and Mrs. Walker on March 19, 1990. They were represented by the same counsel until about September 1993. Mrs. Walker's present counsel in the instant cases

represented both Mr. and Mrs. Walker from March 19, 1990 through April 14, 1993, ceased his representation of them pursuant to leave of this Court, and then resumed being counsel solely to Mrs. Walker on February 3, 1994.

On August 30, 1990, Mr. and Mrs. Walker filed a motion to suppress all evidence obtained from grand jury materials. This Court denied their motion on February 5, 1992. See Walker v. Commissioner, T.C. Memo. 1992-54.

Sometime in October 1993, during the course of pretrial discovery conducted by respondent, Mr. and Mrs. Walker for the first time asserted that Mrs. Walker had not signed the 1978, 1979, 1980, and 1981 returns. In their responses to certain other interrogatories served upon them by respondent, they also denied that, during or after the years in issue, Mr. Walker (1) transferred any assets of over $500 (other than for certain automobiles) to Mrs. Walker; and (2) made any gifts to her.

OPINION

Mr. Walker's Unreported Taxable Income

The parties agree that, during 1978 through 1981, Mr. Walker diverted and received from West Jersey the funds determined in our findings. They also agree that these diverted funds, less amounts Mr. Walker used in purchasing cashier checks for Simmel and the boat for Short, represent unreported taxable income of Mr. Walker for 1978, 1979, 1980, and 1981, except to the extent of additional cash payments that Mr. Walker can establish were made by him "to (or for the direct benefit of)" Short and Simmel

pursuant to the respective overbilling and kickback arrangements with them.

Mr. Walker contends he made additional cash payments to Short and Simmel. He maintains that he directly gave them cash, purchased for them items of expensive clothes and jewelry, and paid for their various trips or outings. He estimates that he made at least $407,900 in additional cash payments to them during 1978 through 1981.

Respondent, on the other hand, contends that Mr. Walker has failed to establish that anywhere near $407,900 of actual additional cash payments were made to Short and Simmel. Respondent asserts that no further reduction in respondent's determination with respect to Mr. Walker's unreported taxable income, for 1978, 1979, 1980, and 1981, is warranted.

We do not accept Mr. Walker's contention that he made $407,900 of additional payments. While the record reflects that some additional payments were made to Short, the $407,900 amount Mr. Walker asserts is excessive. As respondent points out, the payments Short and Simmel received during 1978 through 1981 represented their respective shares of the overbilled amounts West Jersey collected from their employers.

Mr. Walker arrived at the $407,900 amount by estimating that, during 1978 through 1981, he made additional cash payments equal to at least 10 percent of West Jersey's annual gross sales to B.F. Shaw and Pullman. He testified that under the overbilling and kickback arrangements, the overbilled amounts

West Jersey charged and collected were between 10 to 40 percent of the originally quoted price for the overbilled items. However, Short testified that their overbilling and kickback arrangement applied only with respect to specially fabricated items that Short ordered on behalf of B.F. Shaw, and not to stock items. Neither Mr. Walker or Short could provide a precise breakdown with respect to how much of Short's purchases on behalf of B.F. Shaw consisted of specially fabricated items, as opposed to stock items. Short related only that B.F. Shaw purchased more specially fabricated items than stock items. No specific evidence was offered on whether the overbilling and kickback arrangement with Simmel covered all items or only certain items sold to Pullman. Yet, we think that the arrangement applied only to certain items, since Pullman, like B.F. Shaw, would have obtained a price list from West Jersey with respect to stock items Pullman purchased. During 1978 through 1981, Pullman purchased more from West Jersey than B.F. Shaw did.

We thus believe Mr. Walker's $407,900 estimate to be grossly excessive, considering that the overbilling and kickback arrangements did not cover all items that Short and Simmel ordered on behalf of their respective employers, B.F. Shaw and Pullman. A substantial portion of West Jersey's sales to these two contractors involved items not subject to the overbilling and kickback arrangements with Short and Simmel. Further, only the overbilled amounts West Jersey collected, not the entire gross sales price of the overbilled items, was shared with Short and Simmel.

Even if we hypothetically assumed that Short's and Simmel's total shares (consisting of the agreed and alleged additional payments) under the overbilling and kickback arrangements were so high as to equal 10 percent of West Jersey's annual gross sales to their respective employers, the possible additional payments indicated is far less than the $407,900 Mr. Walker asserts.[3] Moreover, the record in the instant cases does not disclose whether other B.F. Shaw and Pullman employees, besides Short and Simmel, placed purchase orders with West Jersey during 1978 through 1981. The overbilling and kickback arrangements may not have operated with respect to these possible sales transactions involving other B.F. Shaw and Pullman employees.

---

[3]Our calculation is as follows:

Short

| Year | 10 Percent of West Jersey's Gross Sales to B.F. Shaw | Agreed Payment Made of Boat | Possible Additional Payments Owed |
|------|------|------|------|
| 1980 | $44,593.90 | $44,141.87 | $452.03 |
| 1981 | 41,067.60 | -- | 41,067.60 |

Simmel

| Year | 10 Percent of West Jersey's Gross Sales to Pullman | Agreed Cashier Check Payments | Possible Additional Payments Owed |
|------|------|------|------|
| 1978 | $45,593.90 | $58,150.00 | ($12,556.10) |
| 1979 | 75,343.00 | 50,705.16 | 24,637.84 |
| 1980 | 93,705.21 | 59,175.00 | 34,530.21 |
| 1981 | 51,350.17 | 11,000.00 | 40,350.17 |

Unfortunately, the records Short and Mr. Walker maintained with respect to the payments due Short under their overbilling and kickback arrangement, were not introduced in evidence. Neither did Mr. Walker offer in evidence the records he maintained with respect to his overbilling and kickback arrangement with Simmel.

We are also skeptical of Mr. Walker's claim that, during his trips to California where Simmel lived and worked, Mr. Walker delivered large amounts of cash to Simmel, in addition to the cashier checks. Mr. Walker was unable to roughly estimate the alleged amounts of cash given to Simmel. Simmel, in his testimony, denied receiving any additional cash payments from Mr. Walker.

As indicated above, the record does reflect that some additional payments were made to Short during 1980 and 1981. Short testified he received a total of $2,000 or $3,000 in additional cash payments from Mr. Walker. He further testified that Mr. Walker took Short and his wife to the 1980 Super Bowl, had given Short and his wife items of jewelry, and paid for sport fishing boat charters on fishing trips that Short took. Short treated these trips, outings, and jewelry items that Mr. Walker provided as payments due Short under their overbilling and kickback arrangement.

Doing the best we can on the record presented, and bearing heavily against Mr. Walker because this inexactitude is of his own

making, we hold that Mr. Walker made a total of $15,000 in additional cash payments to Short and Simmel during 1978 through 1981. See <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930). We further allocate this $15,000 of payments $6,000 to 1980 and $9,000 to 1981.[4]

<u>Joint Individual Income Tax Returns</u>

Section 6013(a) provides, with certain exceptions not relevant here, that a husband and wife may file a joint income tax return notwithstanding that one of the spouses has no gross income or deductions. Generally, a joint income tax return must be signed by both spouses. Sec. 1.6013-1(a)(2), Income Tax Regs.

However, it is settled that where an income tax return is intended by both spouses to be a joint return, the absence of the signature of one spouse will not prevent their intention from being realized. <u>Estate of Campbell v. Commissioner</u>, 56 T.C. 1, 12 (1971); <u>Federbush v. Commissioner</u>, 34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); <u>Kann v. Commissioner</u>, 18 T.C. 1032, 1045 (1952), affd. 210 F.2d 247, 251 (3d Cir. 1953). The question of the spouses' intention is one of fact. <u>Estate of Campbell v. Commissioner</u>, <u>supra</u> at 12.

---

[4]On brief, Mr. Walker argues that he should be allowed "credit" for certain alleged gifts he made to West Jersey's employees. However, in the Stipulation Of Settled Issues the parties agreed that the only remaining issue with respect to Mr. Walker's 1978, 1979, 1980, and 1981 unreported taxable income was his alleged additional cash payments to Short and Simmel. The "credit" issue is thus not properly before us.

The intent to file jointly may be inferred from the acquiescence of the nonsigning spouse. Id. at 12-14. A spouse's failure to file a separate return has been considered an indication that the spouse "tacitly consented" to the filing of a joint return. Abrams v. Commissioner, 53 T.C. 230, 234 (1969); Heim v. Commissioner, 27 T.C. 270, 273-274 (1956), affd. 251 F.2d 44 (8th Cir. 1958); Carroro v. Commissioner, 29 B.T.A. 646, 650 (1933).

Mrs. Walker contends that she cannot be found to have intended and to have filed joint returns with Mr. Walker for 1978, 1979, 1980, and 1981. She argues that the so-called tacit consent rule is inapplicable because she had no separate taxable income of her own to report during 1978 through 1981.

Respondent contends that Mrs. Walker intended the returns Mr. Walker filed for them to be joint returns. We agree with respondent.

From the time of their marriage in June 1963 through at least 1989, Mr. and Mrs. Walker have had a long history of customarily filing joint returns.[5] Mrs. Walker relied entirely

_____

[5]In our findings, we have determined that Mr. and Mrs. Walker filed valid joint individual income tax returns for themselves for the years 1963 through 1977. Although Mrs. Walker initially testified that she never signed any of the joint returns Mr. Walker filed for them until about 1985, we do not believe such to have been the case. When specifically questioned about this on cross-examination by respondent's counsel, Mrs. Walker replied that she "really couldn't say" and could not remember. While Mrs. Walker may have dispensed with actually signing the returns Mr. Walker filed for them at some point prior to the years in issue, the record reflects, and we are convinced,

upon Mr. Walker to prepare and file their returns. The record reflects that Mrs. Walker left the responsibility for preparing and filing the returns to Mr. Walker, and that she intended the returns to be filed as he chose. From June 1963 through the time of trial, Mr. and Mrs. Walker have continued to live together and enjoy the benefits of their economic community. These facts are evidence establishing that Mrs. Walker intended that the 1978, 1979, 1980, and 1981 returns Mr. Walker filed for them be joint returns. Estate of Campbell v. Commissioner, supra at 2, 12-14; see also Estate of Krock v. Commissioner, T.C. Memo. 1983-551. Further, Mrs. Walker accepted the benefits from her and Mr. Walker's filing of joint returns for 1978, 1979, 1980, and 1981. The record reflects they received tax refunds as a result of their filing of these returns. See Heim v. Commissioner, 27 T.C. at 274.

Indeed, from the time the returns were filed through about October 1993, Mrs. Walker never undertook any affirmative act indicating that she intended the 1978, 1979, 1980, and 1981 returns be anything other than her and Mr. Walker's joint returns. At trial, Mrs. Walker acknowledged receiving in the mail, during the period from about late December 1985 through 1988, a series of four letters from

that she viewed her actual execution of the returns to be a mere formal ritual, and that she, nevertheless, consented to the returns being their joint returns. Estate of Campbell v. Commissioner, 56 T.C. 1, 12-13 (1971).

the IRS enclosing the Form 872 extensions. Mrs. Walker stated that she had noted and was aware that the letters were addressed to both her and Mr. Walker. She discussed the letters with Mr. Walker and was told by him that they had to sign the Forms 872, which she did.

Mrs. Walker should have been aware her tax liabilities were under investigation. Yet, she never intimated to the various taxpayer representatives who represented her and Mr. Walker during the course of the examinations the Internal Revenue Service conducted of Mr. and Mrs. Walker's returns, or to the attorneys who prepared her and Mr. Walker's petition in the instant cases, that she had not signed or intended to file joint returns with Mr. Walker.

It was only in October 1993, over 42 months after Mr. and Mrs. Walker's petition had been filed, that Mrs. Walker first raised any claim that the 1978, 1979, 1980, and 1981 returns were not joint returns. This assertion was made over 11 years after the 1981 return was filed and was merely an afterthought. This Court has previously rejected such delayed attempts to disavow a joint return. O'Connor v. Commissioner, 412 F.2d 304, 309-310 (2d Cir. 969) (finding of joint returns upheld where 15-year delay occurred before taxpayers challenged Commissioner's view of the returns), affg. in part and revg. in part and remanding T.C. Memo. 1967-174; Estate of Campbell v. Commissioner, 56 T.C. 1, 14 (1971) (late attempt to discredit joint return "appears to us to be merely an afterthought"); Federbush v. Commissioner, supra; see also Alioto v. Commissioner, T.C. Memo. 1994-

51 (assertion raised 13 years after the fact was a tactical afterthought without substance).

We hold that the 1978, 1979, 1980, and 1981 returns were valid joint returns of Mr. and Mrs. Walker.

### Innocent Spouse Relief

Spouses filing a joint return are jointly and severally liable for the tax arising therefrom. Sec. 6013(d)(3). The innocent spouse rule of section 6013(e) permits a spouse to avoid joint and several liability in certain cases. To qualify as an innocent spouse, it must be established: (1) A joint return was filed for the year in issue; (2) there was a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) the spouse seeking relief did not know or have reason to know of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold that spouse liable for the deficiency. Sec. 6013(e)(1)(A)-(D). A failure to meet any one of these requirements will preclude the spouse from relief. Purificato v. Commissioner, 9 F.3d 290, 293 (3d Cir. 1993), affg. T.C. Memo. 1992-580; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

Respondent acknowledges that Mrs. Walker meets the first two above requirements, but disputes that she is entitled to relief as-an innocent spouse under section 6013(e). Respondent contends (1) that Mrs. Walker knew or had reason to know of the understatements with

respect to the 1978, 1979, 1980, and 1981 returns; and (2) that it is not inequitable to hold her liable. We need not decide whether Mrs. Walker knew or had reason to know of the understatements because we conclude that it is not inequitable to hold her liable for the deficiencies.

In deciding whether it is inequitable to hold a spouse liable for a deficiency, we consider whether the purported innocent spouse significantly benefited beyond normal support, either directly or indirectly, from the items omitted from gross income. Purificato v. Commissioner, 9 F.3d at 296; Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs. Normal support is determined in the context of the circumstances of the particular couple involved. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Flynn v. Commissioner, 93 T.C. 355, 367 (1989).

Mrs. Walker argues that she did not significantly benefit from the unreported income, because, if she benefited at all, the benefit was not beyond normal support. She points out that she and her family already lived very well during preceding years, and claims that their lifestyle during the years in issue did not materially improve and remained essentially the same. However, even with no change in the standard of living, the spouse may fail to meet the requirement of section 6013(e)(1)(D).

Unusual support or transfers of property to the spouse are considered even if the benefit is received after the years in issue. Hayman v. Commissioner, 992 F.2d at 1262; Estate of Krock v. Commissioner, 93 T.C. 672, 679 (1989); S. Rept. 91-1537 (1970), 1971-1 C.B. 606, 607-608. In about 1986, Mr. Walker used at least $40,000 of the proceeds from his liquidation of West Jersey's assets and business to establish another corporation, PSI, whose shares were issued to and held in the name of Mrs. Walker and their son. Additionally, during 1980, Mr. Walker, by way of a check drawn on his and Mrs. Walker's joint checking account, paid over $76,000 to Merrill Lynch for an unexplained purpose.

In their responses to certain interrogatories served upon them by respondent during pretrial discovery, Mr. and Mrs. Walker denied that Mr. Walker, during or after the years in issue, made any transfers of over $-500 to Mrs. Walker or that he had made any gifts of over $500 to her. At trial, these responses of theirs were shown to be untrue. We are not satisfied that Mr. and Mrs. Walker have disclosed all of the assets they owned during and after the years in issue. Neither are we convinced that they have provided full and complete information with respect to all transfers Mr. Walker may have made to Mrs. Walker during and after the years in issue. Mrs. Walker has thus failed to establish that she did not significantly benefit from Mr. Walker's unreported income. Rule 142(a); Purificato v. Commissioner, 9 F.3d at 294-295.

Another factor to be taken into account, in appropriate situations, is whether the spouse has been deserted or is divorced or separated. <u>Purificato v. Commissioner</u>, 9 F.3d at 293-294; S. Rept. 91-1537, <u>supra</u>, 1971-1 C.B. at 608. Mr. and Mrs. Walker are not divorced or separated. They have continued to live together and have supported one another. Mr. Walker has not disappeared and left her to "face the music alone." See <u>Hayman v: Commissioner</u>, 992 F.2d at 1263.

We conclude that it is not inequitable to hold Mrs. Walker liable for the deficiencies. Thus, we hold that she is not entitled to relief as an innocent spouse under section 6013(e).

<u>Decision will be entered under Rule 155 in docket No. 4923-90</u>.

<u>Decisions will be entered for respondent in docket Nos. 18842-90 and 28294-91</u>.